# Exhibit 1

1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF OHIO
2  EASTERN DIVISION

3  -------------------

4  KATHRYN FORTUNATO,

5

6  Plaintiff,

7

8  vs.              Case No. 1:15-CV-1940PAG

9

10 UNIVERSITY HOSPITALS PHYSICIAN

11 SERVICES, INC.,

12

13 Defendant.

14 -------------------

15 Deposition of

16 KATHRYN FORTUNATO

17 June 28, 2016
   9:00 a.m.

18 Location:
19 Vorys, Sater, Seymour and Pease
   200 Public Square, Suite 1400
20 Cleveland, Ohio

21 Grace M. Hilpert-Roach, RPR

22

23

24

25

8

```
 1        Q.     How long do you think it would be; how
 2   many years, more than ten or what range would
 3   you put it in?
 4        A.     Five to ten.
 5        Q.     Let me ask you today, how is your
 6   health today; are you fine?
 7        A.     Yes.
 8        Q.     Are you working today?
 9        A.     No.
10        Q.     When's the last time you were working?
11        A.     When I left the hospital.
12        Q.     When you left University Hospitals; is
13   that right?
14        A.     Yes.
15        Q.     Are you, I guess, medically able to
16   work today?
17        A.     Yes.
18        Q.     Has that been the case since you left
19   University Hospitals?
20        A.     Yes.
21        Q.     Do you have any work restrictions
22   today, meaning if your doctor --
23               MR. PORTER:  Go ahead.
24               THE WITNESS:  Is that okay?
25               MR. PORTER:  Yes.
```

9

1      A.     No.

2      Q.     When was the last time that you had

3  work restrictions, that your doctor would have

4  said, "Ms. Fortunato, you have these

5  restrictions," if ever; do you recall ever?

6      A.     No.  I don't recall.

7      Q.     Let me ask you a little bit about --

8  go into a little bit of the background before

9  we go into University Hospitals.  You've

10  obviously filed a lawsuit in this case, and

11  we're in Federal Court now.  Have you ever

12  filed any other lawsuits?

13      A.     I don't recall.

14      Q.     Your complaint mentions that you filed

15  a charge of discrimination; do you know what

16  that is?

17      A.     Yes.

18      Q.     Have you ever filed a charge, other

19  than the ones at issue in this case?

20      A.     No.

21      Q.     Have you ever filed for Workers'

22  Compensation at any employer?

23      A.     No.

24      Q.     Do you know what that is?

25      A.     I don't recall.

1      Q.     So to the best of your recollection,
2   you have not?
3      A.     No.
4      Q.     Have you ever filed for bankruptcy?
5      A.     I don't recall.
6      Q.     I guess, just so I'm clear, when you
7   say "I don't recall," can I assume that that,
8   to the best of your recollection, is no when
9   you say that?
10      A.     Yes.
11      Q.     I want to make sure, so I don't have
12   to follow up with you.  Okay.
13            Have you ever -- I guess I asked you
14   whether you ever sued anybody.  Have you ever
15   been sued by anybody in any litigation?
16      A.     No.
17      Q.     As to employment, your dates of
18   employment, I guess, approximate dates at UH,
19   tell me about that so we're on the same page,
20   when you began and ended, approximately.  If
21   you know the exact date, great, but I'm just
22   looking for ballpark.
23      A.     I don't recall the exact date.
24      Q.     What years did you begin?
25      A.     2003, I believe.

11

1    Q.    And what year were you discharged?

2    We'll get into the documents, but what do you

3    recall?

4    A.    2014.

5    Q.    And have you sought employment since

6    being discharged?

7    A.    Yes.

8    Q.    And have you had any job offers?

9    A.    No.

10    Q.    And what have you been doing to find

11    work?

12    A.    Internet.

13    Q.    When you say -- I guess, first of all,

14    before I ask you about the Internet, what else;

15    is there any other category?

16    A.    Agencies.

17    Q.    Anything else?

18    A.    Word of mouth, calling people.

19    Q.    Anything else?

20    A.    No.  Unh-unh.

21    Q.    Word of mouth, calling people, I

22    assume those are people that you used to work

23    with?

24    A.    Uh-huh.  No, not anybody that I worked

25    with, just outside friends.

1    studying them.

2         Q.    Like what?

3         A.    The Excel.  We bought the package.

4              MR. PORTER:  One at a time.  He talks,

5    you finish.  If you could say yes or no rather

6    than "uh-huh," the court reporter would

7    appreciate it.

8              THE WITNESS:  Okay.

9         Q.    So you were telling me what computer

10   programs you're proficient in now.  Which ones,

11   if we were at a job interview, would you tell

12   me?

13        A.    Excel.

14        Q.    Any others?

15        A.    No.

16        Q.    Are you proficient today on Excel?

17        A.    Somewhat.

18        Q.    Somewhat.  Okay.

19             If I were to say I need a chart with

20   six categories in the chart and it's going to

21   be 100 different items in those six categories,

22   could you do that?

23        A.    I don't know.

24        Q.    You don't know?

25        A.    No.

1      Q.      When you say "somewhat," I guess, what
2  would you tell me you could do on Excel?
3      A.      I -- I don't recall.  It was all on
4  paper.
5      Q.      On paper?
6      A.      Yeah.
7      Q.      So you haven't actually used Excel?
8      A.      No.  Not in that degree.
9      Q.      Do you have it on your home computer?
10     A.      Uh-huh.
11             MR. PORTER:  Yes, no?
12     A.      Yes.
13     Q.      Have you used it at home?
14     A.      No.  Just -- no.
15     Q.      What kind of tool did you purchase or
16  get to become proficient?
17     A.      I don't recall.
18     Q.      It's like, what, a written book or
19  what is it?
20     A.      No.  It's a CD.
21     Q.      You put it in your computer and --
22     A.      Uh-huh.
23     Q.      -- and watch?
24     A.      Right.
25     Q.      Did it take you through Excel?

17

1  A.  Yes, it did.

2  Q.  Have you actually done it or you just

3 watched?

4  A.  Watched.

5  Q.  So you haven't actually gone through

6 Excel?

7  A.  Yes.

8  Q.  Why did you choose to do that?

9  A.  I don't recall.

10  Q.  Did you do that during your employment

11 at UH or after?

12  A.  Both.

13  Q.  So you've had that at home for how

14 long, that CD, do you think?

15  A.  Over a year.

16  Q.  So right at the end of your employment

17 or how long before; how many months did you

18 have it while you were at UH, do you think?

19  A.  I don't know how to answer that.

20  Q.  Okay.

21    MR. PORTER:  Clarify.

22  Q.  Do you know why you bought it; was

23 there a triggering event?

24  A.  Uh-huh.  Yes.

25  Q.  What was that?

18

1     A.     I was being threatened by my former

2  boss, that she was going to fire me if I didn't

3  get training on my own, and so I went out and

4  spent my own money and got the CD.

5     Q.     Okay.  Did you use it at that time?

6     A.     At home only.

7     Q.     At home only.  Okay.  Why not go

8  through the actual Excel so you could become

9  proficient?

10     A.     I just haven't had time to focus on

11  it.

12     Q.     Do you know how to use Word and Word

13  Perfect?

14     A.     Yes.

15     Q.     And your job interviews, have there

16  been any certain types of, I guess, computer

17  systems that you've been asked about that you

18  have not used?

19     A.     No.

20     Q.     Have you had to show or been given any

21  tests on computer use?

22     A.     No.

23     Q.     So as to when you left University

24  Hospitals -- let me ask you this:  First of

25  all, what sources of income have you had since

```
 1        Q.    If you could look at page 2 of that
 2   document, the second page, is that your
 3   signature on that page?
 4        A.    Yes.
 5        Q.    Could you read to yourself the
 6   particulars, where it says, "The particulars
 7   are"?
 8        A.    "In March of" --
 9        Q.    Read to yourself.  I want to ask you a
10   couple questions about it.
11        A.    Okay.  I've read it.
12        Q.    Let me just ask you:  Does this
13   refresh your recollection that it was March
14   2003, if you look at the beginning of that,
15   until October 29, 2014, your dates of
16   employment?
17        A.    Uh-huh.
18        Q.    You just have to answer yes.  I'm
19   sorry.
20        A.    Yes.
21        Q.    And it says, "I had a disability."
22   What were you referring to?
23        A.    A disability wherein -- mental
24   disability, depression disability.
25        Q.    Depression?
```

```
 1        A.     Uh-huh.

 2        Q.     We'll look at your medical records,

 3   but how long did you have depression?  When do

 4   you believe you were first diagnosed with it?

 5        A.     That would be when I gave Dr. Arafah

 6   that letter.

 7        Q.     Excuse me?

 8        A.     I gave Dr. Arafah a letter, and I

 9   don't remember what the date was on there.

10        Q.     Was it with the documents that you

11   produced to us today; is that what you're

12   saying?

13        A.     Uh-huh.

14        Q.     Okay.  I'll put them in so that you

15   can refer to them.

16        A.     I don't know what the date was.

17        MR. PORTER:  Since you made copies,

18   could we have the originals back?

19        MS. HOLLINGSWORTH:  Sure.

20                   -  -  -  -  -

21        (Thereupon, Defendant's Exhibit 3,

22        Miscellaneous Documents, was marked for

23        purposes of identification.)

24                   -  -  -  -  -

25        Q.     I've handed you what's been marked as
```

1    Exhibit 3.   These are the documents -- I'm

2    going to represent to you -- if you look at 3

3    first, those are the documents that your

4    counsel provided to us this morning.

5         A.    Uh-huh.

6         Q.    I take it these are some additional

7    documents that you believe are relevant to the

8    case?

9         A.    Uh-huh.   2008.

10        Q.    Is there a letter in here that --

11        A.    Uh-huh.

12        Q.    It's the last page?

13        A.    Right.

14        Q.    You say September 9, 2008 is when you

15   were first diagnosed with it?

16        A.    Right.

17        Q.    Let me ask you this:  When I looked

18   through the medical records -- you understand

19   that we got your relevant medical records in

20   this case?

21        A.    Uh-huh.

22        Q.    You have to answer yes.  I'm sorry.

23        A.    Yes.

24        Q.    When I looked through those, this

25   letter -- "this" being the one at the back of

25

1    Exhibit 3 -- is the only letter that I saw that

2    was sent to or given to UH; is that a fair

3    statement?

4        A.    Yes.

5        Q.    So there's no other time, either prior

6    to or after, where you said, hey, here's a

7    letter from my doctor?

8        A.    No.

9        Q.    Okay.  That's what I --

10       A.    I don't recall, but --

11       Q.    Okay.  Because I had looked through

12   it, and I didn't see anything in the records.

13   But today you don't recall any others?

14       A.    No.

15       Q.    That document doesn't say that you had

16   any work restrictions.  And when I say "that

17   document," the letter from your doctor; it just

18   says you're going to be going in for therapy

19   twice monthly?

20       A.    Uh-huh.

21       Q.    You just have to answer yes.  I'm

22   sorry.

23       A.    Yes.

24       Q.    Did the doctor ever give you anything

25   in writing to say, "Ms. Fortunato, you have

1    restrictions beyond these two treatments"?

2         A.    I don't recall.

3         Q.    Okay.  Did you have ever any

4    restrictions?  Today you don't.  Did you ever

5    have any restrictions?

6         A.    Today?

7         Q.    Today I already asked you; you said

8    no.  Did you ever, since that 2008 forward,

9    have any restrictions that you're aware of?

10        A.    No.

11        Q.    So let's go through then this charge.

12   Let's go back to Exhibit 2.  And I just want to

13   ask you about that second paragraph in the

14   particulars.  If you could go to page 2, and it

15   says, "I believe that Deb Conti" -- do you see

16   that?

17        A.    Yes.

18        Q.    And when I read through it, it says --

19   the second sentence says, "Due to my

20   disability, I was not performing at an

21   acceptable level."  Let me ask you:  Did you

22   agree with Ms. Conti that your work performance

23   was not up to UH's standards?

24        A.    No.

25        Q.    What did you mean by that sentence?  I

```
1        Q.      Counselor where?

2        A.      At UH.  A therapist.

3        Q.      This is when you went to the EEOC and

4    you filed a charge, and this was dated, if you

5    look next to your name, February 9, 2015; do

6    you see that?

7        A.      Yeah.

8        Q.      And so that was after you left UH?

9        A.      Right after I left UH.

10       Q.      Right after you left UH?

11       A.      Right.  Like a week later.

12       Q.      Let's look at the document that's

13   marked Exhibit 1, the complaint, there on your

14   left.

15       A.      Uh-huh.  Okay.

16       Q.      That document there.  I just want to

17   ask you a little bit about it just to see if we

18   can have the issues -- if you could turn to

19   page 3 of that document, do you see how the

20   paragraphs are numbered 13 through 19; do you

21   see that?

22       A.      Uh-huh.

23       Q.      Okay.  I just want to ask you a little

24   bit about this.  I guess, first of all, at the

25   bottom of that page, number 19, it says,
```

```
 1     "Defendant hired a person under the age of 40

 2   to replace Plaintiff as doctor's secretary."

 3   Who was that; do you know?

 4       A.    No.

 5       Q.    Do you know who they hired, if

 6   anybody?

 7       A.    Unh-unh.  No.  I don't recall.

 8   Unh-unh.

 9       Q.    Do you know if anybody was hired to

10   replace you or the position was just absorbed

11   or anything like that?

12       A.    I don't recall.  I don't know a thing.

13       Q.    Okay.  And then if we look at

14   paragraph 16, do you see that one where it's

15   numbered 16?

16       A.    Uh-huh.

17       Q.    It says that you were required to

18   learn a new computer program, Excel; do you see

19   that?

20       A.    Uh-huh.

21       Q.    Okay.  There were other programs that

22   you were asked to learn and other issues as

23   well at that time, right?

24       A.    I don't recall.  Just the one.

25       Q.    So we'll get into your documents, but
```

```
 1    you recall that Excel or your inability to use

 2    Excel was one of the issues?

 3        A.    That's right.

 4        Q.    Let me just ask you, if today you're

 5    only somewhat proficient, I assume that you

 6    agree, as of the date of your discharge, that

 7    you weren't proficient; is that a fair

 8    statement, in Excel?

 9              THE WITNESS:  Am I allowed to speak

10    out?

11              MR. PORTER:  Sure.  Answer his

12    question.

13        A.    The question is -- none of us had any

14    teaching, none of us had any background or

15    given an opportunity to learn it.  We were just

16    told you had to learn it.  And we should have

17    been sent to a training school, of which we

18    were not sent.

19        Q.    Okay.

20        A.    And it was all hit and miss, and we

21    were on the computer trying to learn it with

22    phones ringing and people concerned to get the

23    work done and there was no direct classmate --

24    class, you know, organized for us or sending us

25    to schooling the way they should have.
```

1      Q.      When you say "us," I assume it was you

2   and some others?

3      A.      Everybody in the office.

4      Q.      How many other secretaries were there?

5      A.      Three that I can recall.

6      Q.      So there were three other secretaries

7   in addition to you?

8      A.      Yes.   They were all doing a

9   hit-and-miss job, hoping they were doing it

10  right.

11     Q.      I'm just trying to get a little bit of

12  info on the three first.   What were their

13  names?

14     A.      Carol Campbell.

15     Q.      I like her.   I like that last name.

16     A.      Toni, I can't think of her -- her name

17  is Toni.   The last name will come to me.

18     Q.      That's fair.   Who is the third?

19     A.      Who else was in there?   Myself and --

20  well, just three of us at that time.

21     Q.      You think there were just three --

22     A.      Uh-huh.

23     Q.      -- when this Excel issue came up?

24     A.      And my brother-in-law, who is a

25  computer guru, he's the one that said to me,

34

```
 1        Q.     Do you know those ages for a fact or
 2   are you guessing?
 3        A.     Guessing.
 4        Q.     Guessing.  Okay.  What were their
 5   races?
 6        A.     Carol was white, she was white, and
 7   Toni was African American.
 8        Q.     I take it that all three of you were
 9   treated the same as to the computer use, they
10   were saying, hey, you have to know these
11   certain programs?
12        A.     Yes.
13        Q.     Did either of the other two already
14   know how to use Excel and some of the other
15   ones?  No?
16        A.     No.
17        Q.     What part of your job were you
18   expected to use Excel on; what were they -- I
19   mean, was it for cataloging things; what were
20   you doing that you needed to use Excel?
21        A.     I was taking medical records and
22   sending them off to the company who stores
23   them.
24        Q.     Okay.
25        A.     And they wanted them in a certain
```

1   situation with Excel, but they hadn't taught

2   you how to do it.

3       Q.    Okay.

4       A.    So I did the old-fashioned typing

5   type, and they didn't like it.

6       Q.    They wanted it in the computer system;

7   is that a fair statement?

8       A.    Uh-huh.

9       Q.    I assume you agree that at University

10  Hospitals or any hospital one of the most

11  important things is proper maintenance of the

12  medical records?

13      A.    Oh --

14      Q.    Is that important?

15      A.    Oh, yes.

16      Q.    You don't disagree that they would

17  want to know where they're at, right?

18      A.    Every minute.

19      Q.    If a patient or a former patient said,

20  "I want my record," UH wanted to be able to

21  find it?

22      A.    That's right.

23      Q.    And did it come up that they said that

24  you can't just type it in, you have to use

25  Excel?

1    A.    No.  It was no meeting.  She just

2  called me in and started her commentary and

3  said, "I'm giving you two weeks to get this

4  learned."  "Two weeks?"  "And you could go to

5  this library and that library and the other

6  library and learn it."

7  I started calling around, and nobody had any

8  free seats open.  So she wrote me up.

9    Q.    Okay.  And the same was done to Carol

10  and Toni?

11    A.    Just me.

12    Q.    I thought you said that Carol and Toni

13  were asked to know it as well?

14    A.    Yeah.  But I don't think they were

15  written up.  They were asked to do it.  Whether

16  they did it or not --

17    Q.    You don't know how that worked?

18    A.    No.

19    Q.    Could they have gone out and gotten

20  training?

21        MR. PORTER:  Objection.  Go ahead.

22    A.    I guess.

23    Q.    You guess?  Okay.

24        Is that when you went out and bought

25  your Excel?

```
 1        A.     Uh-huh.

 2        Q.     That training packet?

 3        A.     Uh-huh.

 4        Q.     You have to answer yes.

 5        A.     Yes.

 6        Q.     And you said your brother-in-law is a

 7   computer guy?

 8        A.     Uh-huh.

 9        Q.     Yes?

10        A.     Yes.

11        Q.     Did you ask him to show you how to use

12   it?

13        A.     He travels.  He couldn't help me.

14        Q.     Now, I understood that at some point

15   in time you started to use Excel, but there

16   would be issues about saving to the system and

17   some other things like that; is that an

18   accurate statement, that you used it but didn't

19   use it effectively?

20        A.     I don't know.

21        Q.     You don't know?

22        A.     No.

23        Q.     Did you ever try, do you think, or no?

24        A.     Couldn't do much over there, too busy.

25        Q.     I'm talking about at UH.  Did you ever
```

1    actually try it or did you always just say no?

2        A.    I didn't work with it until I finally

3    was able to do a little bit at home.  Unh-unh.

4        Q.    While at UH, did you ever actually try

5    Excel; did you ever actually get on and try?

6        A.    Yes, I did.  They had temporary ones

7    over there, temporary old-fashioned trainings

8    on there, but they didn't have anything that

9    would apply to me.

10       Q.    There were some trainings at UH?

11       A.    Uh-huh.

12       Q.    And you did those?

13       A.    They were -- they weren't the kind

14   that we needed.  It was just telling you how

15   Excel is built, but nothing that you needed for

16   yourself for what job you were doing.

17       Q.    Okay.  And my question now is, when

18   you were given the medical records and they

19   said catalog these before sending them out, did

20   you ever try to put them into Excel?

21       A.    No.

22       Q.    So you always just typed it in?

23       A.    Uh-huh.

24       Q.    Even though Deb Conti had written you

25   up?

```
 1        A.     Uh-huh.

 2        Q.     Is that right?

 3        A.     Uh-huh.

 4        Q.     You have to answer yes.

 5               MR. PORTER:  You have to say yes.

 6        A.     Yes.

 7        Q.     Now, just so I understand how many

 8   categories, was this like you would put the

 9   patient name?

10        A.     Yes, sir.

11        Q.     What other information would you put

12   on --

13        A.     Record number, date of birth.

14        Q.     Anything else?

15        A.     Oh, boy.  We're going back a long way

16   on that one.  Let's see.  The name, record

17   number, date of birth, and -- oh, the number on

18   the box.  So we knew where it find it, the

19   number on the box.

20        Q.     You would have like a four-column

21   lengthy list?

22        A.     Uh-huh.

23        Q.     Is that fair?

24        A.     That's right.

25        Q.     And did you ever go to one of the
```

41

1     A.     I probably could.

2     Q.     I mean, the Excel gets hard when

3   you're trying to -- I mean, you know how you

4   can calculate from boxes and stuff?

5          MR. PORTER:  One at a time.  Let him

6   finish and you answer.

7     A.     It could be a fun program if you take

8   the time and --

9     Q.     Four columns, at this point when

10   you're somewhat proficient, it's probably

11   fairly straightforward, right?  That's the

12   first basic thing you would do, right?

13     A.     Uh-huh.

14     Q.     And I take it that you would type it

15   in with the old typewriter.  Did you think

16   about going on to Word or anything like that?

17   You could have done it on Word and had columns,

18   right?

19     A.     Geez.  I don't remember.  I don't

20   recall. I just don't recall.

21     Q.     You think you used the old-fashioned

22   typewriter?

23     A.     Uh-huh.

24     Q.     Yes?

25     A.     No.  We were all on computer.

1      Q.     You were on a computer?

2      A.     Word.

3      Q.     You went on to Word?

4      A.     You labeled everything and then you

5  saved it and then got it up the next day and --

6      Q.     You put it on Word, but you didn't put

7  it into Excel?

8      A.     No.

9      Q.     Okay.  Was there anything else that

10  you were asked to do at UH that you couldn't

11  do?  This one talks about you needed adequate

12  training.  We're back to paragraph 16.  I just

13  want to know at this point if you can recall

14  anything else that UH said to you, "Ms.

15  Fortunato, we need you to do X," and you

16  couldn't do it because you didn't have enough

17  training; was it just Excel or was there

18  anything else?

19      A.     Telephone.

20      Q.     Telephone?  Okay.

21             Anything else before I ask you about

22  telephone?

23      A.     Well, we were doing prescriptions, and

24  I learned that from the nurse in one hour.

25      Q.     I'm just asking you -- right now I'm

```
1    again and again.  They got mad, because they
2    said, "This is supposed to be confidential."
3    She was running her own set plus the office
4    set.  In the meantime, messages are building
5    up, and Dr. Arafah is catching the devil
6    because he's not returning his phone calls.
7    Why?  Because she had done this. And I thought
8    to myself -- I never complained; I never said a
9    word.  That was -- that's not the way you're
10   supposed to run things.
11        Q.    But my question was, was there
12   anything on the phone that you couldn't do?
13   This one sounds like Carol just kind of made it
14   difficult. Was there anything that you didn't
15   know how to do?
16        A.    No.  We knew how to run the phones.
17        Q.    You knew how to use --
18        A.    Yeah.  It was just neglect going on.
19        Q.    As we sit here today, the only thing
20   that you were asked to do as a medical
21   secretary that you couldn't do was Excel?
22        A.    Excel, yes.
23        Q.    Everything else you were able to learn
24   one way or the other?
25        A.    Uh-huh.
```

45

1      Q.    As to the phone, I take it that even

2  though Carol wasn't giving you the password,

3  you didn't tell your supervisors that, "Hey,

4  Carol is making my life difficult"?

5      A.    You had to be careful what you were

6  saying; you got yelled at for it.

7      Q.    Carol would get mad at you?

8      A.    So would Deb Conti.

9      Q.    Deb would get mad if you said that

10  "Carol is not letting me get messages"?  You

11  think she would be okay with you not being able

12  to get messages and leaving customers at risk?

13      A.    She would just make smart -- difficult

14  comments.

15      Q.    So there were customers who were

16  calling in, patients calling in, and they might

17  not have gotten a follow up because you

18  couldn't get the messages?

19      A.    Uh-huh.

20      Q.    Is that right?

21      A.    That's right.

22      Q.    I assume that when you said the doctor

23  was taking heat, the whole department was

24  probably like, what's going on?

25      A.    They were getting a little mad because

46

```
 1    they weren't getting returned calls.   "Why
 2    didn't you take care of this?"   Why didn't you
 3    do this, that, and other?
 4         Q.    Did you think to raise your hand and
 5    say Carol was doing it?
 6         A.    No.
 7         Q.    No?
 8         A.    No.
 9         Q.    Okay.
10         A.    She's a bully.
11         Q.    She's a bully.   Okay.
12              Let's look at the next page of the
13    complaint, page 4.   If you would turn the page
14    to page 4, I just want to ask you, if we look
15    at paragraph 25, it says, "Plaintiff requested
16    Defendant make reasonable accommodations."   I'm
17    going to represent to you Plaintiff is you and
18    Defendant is University Hospitals Health
19    Systems, Inc.   I think it's changed around
20    today, but it's UH, your former employer.   What
21    accommodations do you recall asking for?
22         A.    I have to think what they're talking
23    about.   Probably throwing a great deal of work
24    on me.   I wound up doing half of her work all
25    the time.
```

1      Q.    Carol's work?

2      A.    Yes.

3      Q.    Is there anything else that you can

4  recall?  Is there anything that you went to Deb

5  Conti about and said -- I take it you went to

6  Deb and said you needed training in Excel,

7  right?

8      A.    It didn't work.  She was rude.  It was

9  a waste of time.

10     Q.    My question is, did you ever go to any

11  supervisor and say, hey, I need certain things

12  for my job or did you just try to do it the

13  best you could?

14     A.    Uh-huh.

15     Q.    Just did the best you could?

16     A.    Yeah.

17     Q.    You didn't go and ask for them to give

18  you help or anything like that?

19     A.    Unh-unh.  Never.  I would go to

20  Dr. Arafah.

21     Q.    What did you talk to Dr. Arafah about?

22     A.    Tell him what's going on.  He would

23  say, "Okay.  I'll check into it."

24     Q.    Did you ever ask Dr. Arafah for any

25  specific changes to your job or anything like

1    that?

2        A.    No.

3        Q.    When did Dr. Arafah leave; was he

4    there when you were let go?

5        A.    As far as I know.  I don't know.

6        Q.    You don't know?

7        A.    No.  I don't know.

8        Q.    Let's just go through some of the

9    basic documents from your employment.

10                    -  -  -  -  -

11        (Thereupon, Defendant's Exhibit 4,

12        Application for Employment, was marked

13        for purposes of identification.)

14                    -  -  -  -  -

15        Q.    Do you recognize Exhibit 4 as your

16    employment application?

17            MR. PORTER:  Take your time,

18    Ms. Fortunato.

19        A.    This is something about radiology.

20    Oh, these are old.

21        Q.    If you look at the last page, is that

22    your signature on that last page?

23        A.    Uh-huh.

24        Q.    You have to answer yes.  I'm sorry.

25        A.    Yes.

1    Q.    And it looks like you applied for work

2    in 2001.  You actually -- it looks like from

3    this you were a temporary employee at UH before

4    your hire in 2003, right?  Is that right?

5    A.    Yes.

6    Q.    So you actually were temporary at UH,

7    and I assume you liked it enough that you

8    applied for full time?

9    A.    Yes.

10   Q.    And they hired you in 2003 after you

11   applied in 2001?

12   A.    Uh-huh.

13   Q.    Is that fair?

14   A.    Yes.

15   Q.    And one of the allegations in this

16   case is that you say UH discriminated against

17   you based on your age.  Let me ask you about

18   your age.  What is your age today?

19   A.    68.

20   Q.    And so even a lawyer could calculate

21   out that in 2001, when you applied, you were

22   53, right?

23   A.    Uh-huh.

24   Q.    No.  I'm sorry.  Yeah, 53.  Right?

25   A.    Right.

```
1         Q.      And when you were hired, you were 55

2    years old?

3         A.      Okay.

4         Q.      Okay.  They hire you; you're over 40,

5    right?

6         A.      Uh-huh.

7         Q.      And did anybody ever -- let me ask you

8    just in general, did anybody ever make any

9    age-based comments to you, anything negative

10   about your age?

11        A.      I don't recall.

12        Q.      Obviously, if somebody would have

13   said, "Hey, we don't like old people here," you

14   would recall that --

15        A.      No.

16        Q.      -- right?

17               So let me show you some of the

18   policies from your employment.

19                       -  -  -  -  -

20        (Thereupon, Defendant's Exhibit 5,

21        Corporate Code of Conduct, was marked for

22        purposes of identification.)

23                       -  -  -  -  -

24        Q.      These are just some of the

25   acknowledgements that you signed off on during
```

```
1       A.      Yes.   That was David -- the man who

2   wound up in jail, David -- I can't think of his

3   last name now.   The man who worked in our -- he

4   was our director, and he wound up in jail for

5   stealing money from the hospital.   I can't

6   think of his last name.   Brooks.   David Brooks.

7   It was awful.

8                       -   -   -   -   -

9       (Thereupon, Defendant's Exhibit 7,

10       Summary of Corrective Actions from

11       2001-2011, was marked for purposes of

12       identification.)

13                      -   -   -   -   -

14      Q.    I'm showing you what's Exhibit 7.   I'm

15   happy to pull all these documents out if you

16   like, but why don't you look through the

17   summary.   What I did is I asked Liana here to

18   just do a quick summary of some of your prior

19   discipline prior to 2011.   Is there anything on

20   here that you don't recall or disagree with?

21      MR. PORTER:   Hold on.   Objection to

22   the document.   It's a summary prepared by

23   opposing counsel.

24      But you have the right to read that in

25   detail, if you want, Mrs. Fortunato, before you
```

58

1    answer any questions and with particular regard

2    to how things are phrased.

3         Are you entering this as an exhibit?

4         MR. CAMPBELL:  Yeah.  We put it in as

5    Exhibit 7.

6         A.    Okay.  Yeah.

7         Q.    Is there anything on there that you

8    don't recall?

9         A.    Oh.  I recall quite a few of them.

10        Q.    And I'm just showing you this.  You

11   certainly received discipline at times during

12   your employment; is that fair?

13        A.    I wouldn't call it fair, but yeah, I

14   did.

15        Q.    I'm not saying whether you agreed with

16   the discipline.  I'm just saying, is it a fair

17   statement that you received discipline on

18   occasion during your employment?

19        A.    Yes.  Do you want me to explain any of

20   that?

21        MR. PORTER:  If there's anything that

22   you would like to --

23        A.    His name is David Brooks.  And he went

24   around giving everybody a very difficult time.

25   And he would go in and accuse you of something

59

```
1    that you hadn't done, but I would just like

2    drop it and say, "Sorry, I'll do better next

3    time."

4        Q.    I really want to focus on the last

5    years of your employment because I don't think

6    any of these things -- your discipline in 2001

7    didn't cause you to be discharged in 2013,

8    right?

9        A.    No.  Unh-unh.

10                    -   -   -   -   -

11        (Thereupon, Defendant's Exhibit 8, UH

12        Performance Evaluation, was marked for

13        purposes of identification.)

14                    -   -   -   -   -

15        Q.    You've been handed what's been marked

16    as Exhibit 8.  You're welcome to look through

17    it.  Let me know when you -- I guess you can

18    look through it as much as you can, and I'll

19    ask you some questions about it.  Once you take

20    a look at it, let me know when you're ready to

21    answer some questions.

22        A.    Uh-huh.

23        Q.    Excuse me?

24        A.    They didn't have too much nice to say.

25        Q.    Do you recognize your signature on the
```

1    documents?

2        A.    I probably did.

3        Q.    I see it on page 6; is that right?

4        A.    Yeah.

5        Q.    Let's just go through some.  As you

6    say, they didn't have too much nice to say.  It

7    looks like they did say that you frequently met

8    expectations as to teamwork, if you look at

9    page 3.

10       A.    Okay.

11       Q.    Is that fair?

12       A.    Uh-huh.

13       Q.    You have to answer yes.

14       A.    Yes.

15       Q.    If you turn to page 5, they did say

16   that you promoted the code of conduct and that

17   you adhered to the code of conduct; do you see

18   that?

19       A.    Uh-huh.

20       Q.    But the remainder "does not meet

21   expectations" -- although, no, I take that

22   back.  Integrity, you frequently met

23   expectations as well on page 3?

24       A.    Okay.

25       Q.    If you look at page 3.

64

```
 1    our having to undertake a very difficult
 2    deposition of late concerning a former
 3    co-worker, that you could have a little
 4    understanding and be a little more grateful for
 5    something in my employment, as I am thinking I
 6    am doing my best which is not reflected in this
 7    review at all.  It is awful."  It was awful.
 8         Q.    Okay.  And then in the next paragraph
 9    it does talk about that you went to the
10    hospital for severe anemia?
11         A.    Uh-huh.
12         Q.    And then you said, since going to the
13    hospital, it's been okay?
14         A.    Right.
15         Q.    Okay.  So I don't see anything in here
16    -- your counsel wanted you to review that.  At
17    this point I don't see anything in here where
18    you say anything about your age; is that a fair
19    statement?
20         A.    No.
21         Q.    And it doesn't say anything in here
22    about depression or Excel; is that a fair
23    statement?
24         A.    Uh-huh.
25         Q.    So at this point in time, as your
```

65

1    counsel pointed out, this was you saying, hey,

2    this is what I'm upset with and let me give you

3    my summary of everything?

4        A.    Yes.

5        Q.    As you recognize, the evaluation was

6    certainly negative, right?

7        A.    It was awful.

8        Q.    Awful.  Okay.

9              And that caused you -- at this point I

10   assume you understood that potentially you

11   could be subject to discharge?

12       A.    She was working on it.

13       Q.    I'm asking you.  I mean, if you look

14   at the evaluation itself, certainly you

15   understood that in her eyes you needed to

16   improve your performance?

17       A.    I didn't agree with it, but yeah.

18             MR. CAMPBELL:  Why don't we take a

19   short break, and we'll come back in.  We could

20   take about a five-minute break.

21                  (Recess had.)

22       Q.    Before we leave Exhibit 8, I just want

23   to ask you a little bit about it.  If you could

24   turn to page 2, and it's the continuation of

25   the diversity, UH values, and it says, "Does

1    not meet expectation."  If you look at the

2    right-hand column, it says, "Making

3    inappropriate comments about fellow co-workers

4    that can be misconstrued as derogatory and not

5    in line with our efforts to establish

6    relationships based on embracing diversity."

7    Do you see that?

8             MR. PORTER:  What page are we on?

9             MR. CAMPBELL:  Page 2 of Exhibit 8.

10        Q.    If you look at the bottom of that

11   page, do you see "Diversity," and if you turn

12   the page, I just read to you the right-hand

13   statement there.

14        A.    Okay.

15        Q.    Do you see that where I read from?

16        A.    Uh-huh.

17        Q.    What do you recall as to the

18   statements that may have been misconstrued as

19   derogatory by your co-workers?

20        A.    I never made any comments, but the

21   psychiatrist I went to read this.

22        Q.    Read this?

23        A.    Uh-huh.

24        Q.    What did the psychiatrist say?

25        A.    He said he thought it was ridiculous,

1  and he didn't believe that I had anything to

2  say, and I said I didn't.  He said, "Well,

3  let's just let it go as a bad written

4  statement; that's all."

5      Q.    Did you make any comments about like

6  your neighborhood or anything like that?  I

7  heard that you might have said something about

8  how your neighborhood had changed?

9      A.    Unh-unh.

10      Q.    No?

11      A.    Unh-unh.

12      Q.    Nothing that could have been

13  derogatory?

14      A.    Unh-unh.

15      Q.    Did any of your co-workers allege that

16  you had done anything like that?

17      A.    No.

18      Q.    Let me show you a couple other

19  documents.

20                    -  -  -  -  -

21      (Thereupon, Defendant's Exhibit 9, PIP

22      12-3-13, was marked for purposes of

23      identification.)

24                    -  -  -  -  -

25      Q.    I'm showing you what's been marked as

1    Exhibit 9, and you're welcome to look through

2    that.  Let me know when you're ready to answer

3    some questions about Exhibit 9.

4        A.    I don't know which one you're talking

5    about.

6              MR. PORTER:   This one right here.

7              THE WITNESS:   All this paperwork.

8    Okay.  Now we're over here.

9        Q.    Is that your signature at the end of

10   Exhibit 9?

11       A.    Yes.

12       Q.    And if you look, there's some

13   handwriting on pages 2 and 3 of the document;

14   is that your handwriting?

15       A.    Yes.

16       Q.    And if we look through some of these

17   -- I guess, first of all, did you understand

18   this was a performance plan?

19       A.    I don't recall.

20       Q.    You don't recall?

21       A.    No.  Not offhand.

22       Q.    This followed up to that evaluation

23   that we looked at?

24       A.    Oh, that's right.

25       Q.    They gave you some goals and

```
1    performance standards?

2         A.    Yes.

3         Q.    If we look at some of the issues, we

4    have "Issue number 1, effective communication

5    skills," and it talks about e-mails without

6    subject lines, not using the proper greeting

7    when answering the phone, incomplete written

8    communication, using internal reference like

9    "bumped" or "cancelled" when speaking with

10   patients; do you see those?

11        A.    I see.

12        Q.    They gave you some expectations.  If

13   we look at page 2, it goes through a number of

14   issues, right?  I mean, I think we get through,

15   it looks like five issues, and if we look at

16   number 4, just to follow up on the diverse work

17   force, page 2, issue number 4, it says that you

18   made reference --

19        A.    Oh, yeah.  I read that.

20        Q.    It says, "References to the work

21   performance of your African American coworkers

22   as 'you know how they are.'"  Did you ever say

23   that?

24        A.    No, I didn't.  I went to Deb Conti on

25   that comment.
```

```
 1        Q.     You told her no, you didn't do that?
 2        A.     I said, no, I didn't and "Where did
 3   you get that idea?"  She said, "I thought I
 4   heard you say it, but maybe I was wrong."
 5   That's what she told me that day.
 6        Q.     So you disagree on those?
 7        A.     Oh, yeah.  Uh-huh.  And I also brought
 8   this to somebody's attention, because, as a
 9   whole, in our office we should have had an
10   office party or a meeting where they told us
11   exactly what they wanted done on some of these
12   issues, and that's what the other African
13   American girl was trying to tell them for weeks
14   and months.  There's no -- we don't know what
15   our responsibilities are and what you want and
16   what you don't want.  Everybody does their own
17   thing, which was right there, in all that, you
18   know.
19        Q.     Toni was saying those same things?
20        A.     Exactly.  And she was fuming mad about
21   it because she said that we don't know whether
22   we're coming or going; there's no sense of
23   structure.  That was her -- yeah.
24        Q.     I assume, after you got Exhibit 9, you
25   knew what was expected of you?
```

1    A.    Uh-huh.  We had no work hours

2  scheduled.

3                  -  -  -  -  -

4       (Thereupon, Defendant's Exhibit 10, PIP

5        8-19-14, was marked for purposes of

6        identification.)

7                  -  -  -  -  -

8    Q.    If you go to the next document, that's

9  Exhibit 10.

10    A.    Uh-huh.

11    Q.    Exhibit 10, it looks like a lot of the

12  same issues were raised.

13    A.    Uh-huh.

14    Q.    This one was given to you in August

15  2014.  Do you see the date on that?  And if you

16  look at page 3, you signed it September 3,

17  2014.

18    A.    Might have.

19    Q.    Right?

20    A.    Yes.

21    Q.    So you signed that.  And this one goes

22  through, it looks like, one issue --

23    A.    It's got the wrong date on it.

24    Q.    It looks like four issues, but they've

25  numbered them as five.

1    A.    Okay.

2    Q.    And I assume if you signed this, you

3    reviewed this with Deb when she gave it to you?

4    A.    I didn't sign it with her, but I

5    signed it.

6    Q.    You signed it?

7    A.    Uh-huh.

8    Q.    On this one I don't see any

9    handwritten comments.  Why no handwritten

10   comments on this one?

11   A.    Apparently I didn't care to make any

12   comments here to her.

13   Q.    You didn't give any written statement

14   or typed statement like you did on the

15   evaluation, right?

16   A.    Unh-unh.

17   Q.    You have to answer yes or no.

18   A.    No.

19   Q.    And then when I look at 9 and 10, they

20   both give you, at the end -- you know, there's

21   certain days that you have -- if you look at

22   before you sign, there's certain days for

23   follow-up and potential, you know, additional

24   discipline.  What happened with your first

25   performance improvement plan?  Did you satisfy

1    everything or what happened as to Exhibit 9,

2    you know, that you continued to remain

3    employed?

4        A.    Exhibit 9 is here.

5        Q.    Exhibit 9 is from December 2013 and

6    then it looks like instead of discharging you

7    for failing to meet the standards, they gave

8    you a second performance improvement plan in

9    September of 2014, so about nine months later

10   you got a second one.  Do you know why that was

11   the case, why you were given two opportunities?

12       A.    No.  No.

13       Q.    Did you discuss with Deb --

14       A.    No.

15       Q.    -- in September that these were a lot

16   of the same issues as you had been having?  No?

17       A.    No.  Unh-unh.  She was not an

18   individual that you could talk with, so we just

19   let it go at that.

20                    -   -   -   -   -

21           (Thereupon, Defendant's Exhibit 11,

22           Corrective Action, was marked for

23           purposes of identification.)

24                    -   -   -   -   -

25       Q.    Do you recognize Exhibit 11?

1     A.    Okay.  Uh-huh.

2     Q.    And that was your discharge?

3     A.    Uh-huh.

4     Q.    Is that right?

5     A.    Yeah.  I can make a comment on that.

6     Q.    I see you did make some comments.

7  Although you didn't sign it, you did make some

8  comments on the back, right?

9     A.    Yeah.

10    Q.    Let me just ask you, do you agree

11 that, when we look at your performance

12 improvement plan, that there was many issues

13 beyond the Excel; is that a fair statement?

14    A.    No.

15    Q.    No?

16    A.    No.

17    Q.    You don't agree that Exhibit 10 --

18    A.    No.

19    Q.    -- went through a lot of points?

20    A.    Well, it did, but they weren't

21 necessarily needed.  I wasn't doing anything

22 wrong.

23    Q.    I guess I'm not asking whether you

24 agree or not.  I'm asking you, did Ms. Conti

25 tell you that she believed your performance was

1  lacking far beyond Excel?

2      A.    She did in the beginning, and in the

3  end she told me how fabulous I was doing and

4  then fired me.

5      Q.    If you look at the last page of that

6  Exhibit 11, it says, "Kathryn has shown minimal

7  improvement on her performance improvement

8  plan." Do you see that?

9      A.    No.   Which one is that?

10      Q.    The last page of Exhibit 11.  If you

11  turn to the last page.

12      A.    Okay.   Thank you.

13      Q.    Do you see that first sentence,

14  "minimal improvement"?

15      A.    Uh-huh.

16      Q.    You have to answer yes.

17      A.    Yes.

18      Q.    And then it says, "There continues to

19  be significant performance concerns," and it

20  goes through patient scheduling errors; did you

21  ever have those?

22      A.    Very few.

23      Q.    "Including incorrect patient/physician

24  or location," did you ever have those?

25      A.    Very few.

76

```
 1        Q.     You had them, but it's just not that
 2   many?
 3        A.     Not that many.  Unh-unh.
 4        Q.     "Delay in responding to patient
 5   needs," did that ever happen?
 6        A.     No.
 7        Q.     And then it says, "In the role of a
 8   doctor's secretary, it's imperative to have
 9   strong communication and collaboration skills."
10   Did you agree with that?
11        A.     I don't know what that meant.
12        Q.     You don't know that you would have to
13   communicate well with your patients?
14        A.     Oh, sure.  Yeah.  Yeah.
15        Q.     You would have to work with Carol and
16   others to be able to service them, right?
17        A.     Yes.
18        Q.     And it says, "Kathryn has continued to
19   not meet expectations in these critical skills
20   for the role."  Do you see that?
21        A.     Yes.
22        Q.     And then it says, "Throughout the PIP,
23   she has not appropriately responded to meeting
24   requests and patient messages continue to be
25   unclear or incorrect."  Did you have issues
```

```
 1    with attending the meetings that were scheduled

 2    with Deb and HR about your PIP?

 3         A.    There were no meetings.

 4         Q.    Did they send you calendar invites and

 5    you failed to attend?

 6         A.    Nope.  There was one I didn't -- I

 7    didn't know anything about.

 8         Q.    One that you didn't know anything

 9    about?

10         A.    I didn't answer to one, yes.

11         Q.    Did you go to the meeting?

12         A.    I went to everything that I was asked

13    to go to, yes.

14         Q.    So there were meetings with HR and

15    with Deb?

16         A.    No.  Just her.  And she brought down

17    the other girl, that Williams girl.

18         Q.    She's in human resources?

19         A.    Yeah.  Uh-huh.

20         Q.    They would meet with you and review

21    your performance before your discharge?

22         A.    They would meet with me, but nothing

23    was ever -- nothing was ever worked out.

24         Q.    Nothing was ever --

25         A.    It was all negativity, and you're a
```

```
1    bad girl and this, that, and the other.  And

2    that's when I tried to tell them that I was on

3    a medication and to please be patient with me.

4    And that's when they sent me to Springer, and

5    she said the same thing and then Conti went

6    ahead and did what she chose to do.

7         Q.   Who's Springer?

8         A.   She's a counselor --

9         Q.   Okay.

10        A.   -- for UH.  And if you're having any

11   kind of problems, you're supposed to go to this

12   lady.  And I did.  And I walked in there, and I

13   told her that I had just gotten reamed.  I

14   don't even know what it was for.  It had me a

15   little bit on the nervous jittery side, and she

16   said she's known for being that way.

17        Q.   Okay.  So let's look at the second

18   page of that document.  I just want to ask you

19   about a couple things.  You did write, "The

20   enclosed reasons for termination are not true

21   or realistic."

22        A.   They weren't.

23        Q.   Did you write that; is this your

24   handwriting?

25        A.   Yes.
```

1    she said, "Nobody has ever given you the right

2    kind of medication." And that's when she put me

3    on Prozac and Ambien.  And then she told me

4    that I needed to go to a psychiatrist and get

5    more counseling, which I did.  I went to Dr.

6    Wilmington.

7         Q.    Okay.  So the counselor, this

8    Dr. Acheson, A-C-H-E-S-O-N, that was a UH

9    counselor?

10        A.    She was a physician --

11        Q.    Physician?

12        A.    -- in family services.

13        Q.    She said to you, "I don't think your

14   treating physicians have given you the right

15   medications"?

16        A.    That's right.  She said you should be

17   on whatever it was, and she put me on it.

18        Q.    And she sent you to a psychiatrist?

19        A.    Yes.  She sent me to a psychiatrist.

20        Q.    And how did that have anything to do

21   with your termination?

22        A.    How did that have anything to do with

23   my termination?  They figured if you're on

24   medication, you're not functional for us, I

25   would guess.

1    Q.    Do you think that -- I guess my

2    question would be, how did anybody know, aside

3    from Dr. Acheson, that you were on medication?

4    A.    Carol knew it.

5    Q.    Carol knew it.  Okay.

6    A.    She knew it.  Yeah.

7    Q.    How would Carol know?

8    A.    I probably told her I was going to the

9    doctor, and she told me -- oh, I know what

10   happened.  They were discussing something one

11   day, and she told Dr. Arafah that she had just

12   gone to a psychiatrist, and he told her she

13   should be on certain medication, and that's

14   when I said, "Well, I'm on such."  This was a

15   long time ago.  It was just like people

16   conferring.  That's all.

17   Q.    You're saying like back around that

18   letter, '08 or '09, is when you said that?

19   A.    Uh-huh.

20   Q.    Right?

21   A.    Yes.

22   Q.    I guess my question is, how does that

23   cause you to be terminated in 2014; do you see

24   that as having any role?

25        MR. PORTER:  Objection.  Go ahead.

1   A.  I wouldn't even know how to answer

2 that.

3   Q.  Okay.  And then --

4   A.  Yeah.

5   Q.  The final thing it says, "My age of 67

6 that should not be considered."  Do you see

7 that number 3?

8   A.  Yeah.

9   Q.  Why do you think your age was

10 considered?

11   A.  Because they can get a younger girl in

12 there and do twice the work.

13   Q.  But you don't know if anybody was

14 brought in?

15   A.  No.  I know they had a couple girls

16 coming through the door, and they looked like

17 they were prospects to be interviewed, but I

18 never questioned it.  You don't question

19 everybody that comes in the door.

20   Q.  Aside from seeing some younger women

21 coming through the door, you don't know if they

22 were there for job interviews or what, right?

23   A.  Never asked.

24   Q.  And when did they come through the

25 door?

89

1      A.     Shortly before I got fired.

2      Q.     Shortly before?

3      A.     Yes.  Like a week or two.  And you

4  come in with a suit and you're all dressed up,

5  and you know you're not there to sell drugs,

6  you know what I mean, drug reps, so --

7      Q.     So you didn't -- you assumed they

8  weren't there to sell pharmaceuticals to the

9  doctors, but they might have been there to

10 interview for some job?

11     A.     I think so, yeah.

12     Q.     You think so?

13     A.     Uh-huh.

14     Q.     Did you ask anybody?

15     A.     Nope.

16     Q.     Is there anything else that made you

17 think that your age was considered?

18     A.     Yeah.  I heard people talking, and

19 they were saying that when you got to a certain

20 age, they were going to let them go.  It was in

21 the hallway; one of the supervisors were

22 talking.  And it was kind of chaos in the

23 hospital that if you were a certain age, you

24 were on your way out.

25     Q.     When and who said this?  Did you even

1    know who that person was?

2        A.    Dr. Acheson said something when I went

3    back.  She said, "Did you get" -- and I said,

4    "Yeah."  She said that they're doing that to

5    anybody who's over whatever age group it was.

6    "Thanks a lot because I got it."

7        Q.    So you think Dr. Acheson said that to

8    you?

9        A.    She said it to me, yeah, in passing

10   when I was --

11       Q.    In passing?

12       A.    Yeah.  I think it was just a common --

13   if you were a certain age, you were on your way

14   out.

15       Q.    My question is, first of all, you say

16   Dr. Acheson said it during -- this is after

17   your discharge, when you're talking to her, you

18   still were in there?

19       A.    I don't recall.

20       Q.    Did you see Dr. Acheson after you were

21   actually discharged?

22       A.    Uh-huh.  I went in there with my

23   daughter one time for an office appointment.

24       Q.    You think that during that appointment

25   is when she said that?

```
1         A.     She just said, in general, a lot of

2    people are getting terminated at this age,

3    yeah.

4         Q.     At this age?

5         A.     Uh-huh.

6         Q.     This was after your discharge?

7         A.     Yes.  Uh-huh.

8         Q.     And then you said there was something

9    about you overheard some people talking in the

10   hall?

11        A.     Yeah.  They were in the hallway, just

12   making comments that they were starting to let

13   people go at a certain age point.

14        Q.     Do you know who they were?

15        A.     No.  Just generalized conversation.

16        Q.     Do you know when that generalized

17   conversation took place?

18        A.     No.

19        Q.     Was it right around your termination?

20        A.     I think so.

21        Q.     You think so?

22        A.     Uh-huh.

23        Q.     Was there anybody else -- let me ask

24   you this:  Ms. Campbell, was she still employed

25   when you were let go?
```

1      A.      Uh-huh.  Yes, sir.

2      Q.      Is she still there?

3      A.      Well, I saw her about a month ago

4  getting on an elevator, and I think she still

5  is there, but I don't speak to her.

6      Q.      You think she's probably close to 60

7  now?

8      A.      She's a year younger than me.

9      Q.      How old would she be today?

10         MR. PORTER:  Objection.  Go ahead.

11     A.      67, I guess.  66, 67, something like

12  that.

13     Q.      I thought when we went through

14  initially you said she was in her 50s.

15     A.      No, no, no.  She's older than that.

16     Q.      So they didn't discharge her?

17     A.      Not that I know of.  I'm not allowed

18  to talk to those people, so I never -- I'm

19  supposed to keep to myself.

20     Q.      When you left, Ms. Campbell was still

21  there?

22     A.      As far as I know.  Uh-huh.

23     Q.      Toni was in the department, and Toni

24  was, you thought, what age?

25     A.      Toni was in her 40s.

1      Q.      And Toni was still employed when you

2   were let go?

3      A.      Yes.

4      Q.      How old do you think Deb Conti is?

5              MR. PORTER:   Objection.   Go ahead if

6   you know.

7      A.      Probably late 50s.

8      Q.      Okay.   Let me ask you this:   You say

9   you heard comments that people, once they reach

10  a certain age, are let go at UH?

11     A.      Uh-huh.

12     Q.      Can you tell me anybody that was let

13  go that was over 60 that you're aware of, any

14  names?

15     A.      No.

16     Q.      You just overheard these comments, you

17  say?

18     A.      Yeah.

19                      -   -   -   -   -

20          (Thereupon, Defendant's Exhibit 12,

21          12-19-13 Meeting and 12-31-13 Meeting,

22          was marked for purposes of

23          identification.)

24                      -   -   -   -   -

25     Q.      You've been handed what's been marked

1    Q.    Okay.

2    A.    Somebody just has strange ideas in

3    their mind, I guess.

4    Q.    Let me just ask you, we went through

5    -- obviously, there was lots of things that

6    happened in your employment, and I've tried to

7    focus us on the documents that the hospital

8    believes led to your ultimate discharge.

9    A.    Uh-huh.

10    Q.    Just so I understand, as to the

11    performance issue, I think you said at one

12    point that -- you have said that you couldn't

13    do Excel. I'm not saying that you believe you

14    should have gotten training, but you admit that

15    you couldn't do that?

16    A.    No.  Not well enough.

17    Q.    You believe that you could do

18    everything else that was asked, right?

19    A.    Yes.

20    Q.    You said at one point that it may have

21    appeared that you had made mistakes because of

22    Carol Campbell; is that an accurate statement?

23    A.    Yes.

24    Q.    And I think you said that if somebody

25    came to you and said, hey, this mistake was

1    made, that you wouldn't speak up and say Carol

2    Campbell caused it; is that fair?

3        A.    Uh-huh.

4        Q.    So I guess with that, let me just ask

5    you, I know that you disagree -- you don't

6    agree with all of the performance issues Ms.

7    Conti laid out, right?

8        A.    No.

9        Q.    Are some of them accurate based on

10   what Carol Campbell was doing?

11           MR. PORTER:  Objection.  Go ahead.

12       A.    I don't recall, really.

13       Q.    Were there some patient issues?

14       A.    There were some patient issues I went

15   ahead and straightened out for her.

16       Q.    Did the doctors or Ms. Conti believe

17   that some patient issues were caused by you?

18           MR. PORTER:  Objection.  That's a

19   question for them.  Go ahead.

20       A.    No.

21       Q.    No?

22       A.    No.

23       Q.    Did they believe that some of your

24   communications might not have been up to par?

25           MR. PORTER:  Same objection.

```
 1        A.     No.

 2        Q.     You do agree that, I guess at least

 3   over the last year of your employment, Ms.

 4   Conti was giving you some specific performance

 5   issues that she believed you needed to improve

 6   upon, right?

 7        A.     Just that one.

 8        Q.     I think we went through --

 9        A.     That was it.

10        Q.     I'm happy to go back through them, but

11   you got two performance improvement plans,

12   right?

13        A.     Right.

14        Q.     And then you guys met a number of

15   times, right?

16        A.     Right.

17        Q.     And HR came down, right?

18        A.     Yeah.  But during those times, I tried

19   to tell them that I was on medication for

20   depression, please stop screaming and yelling

21   at me, please stop throwing things at the

22   table.  They just kept right on going, and he

23   said, "That's your problem, not mine."

24        Q.     I guess you're saying that they were

25   really upset because they believed your
```

1    performance was really bad?

2        A.    No.

3        Q.    What would cause the arguments?

4        A.    They were trying to get rid of me.

5    It's that simple.  They were trying to dump me.

6    They were -- what's the word for it? --

7    indifferent, difficult.

8        Q.    What was the yelling about in the

9    meetings; what do you recall?

10       A.    Well, you should have known better and

11   this, that, and the other.  I tried to tell

12   them I hadn't even done anything wrong, and

13   they just continued to --

14       Q.    I think you said they were negative.

15   Obviously, I mean, you do agree that there are

16   times when if an employee --

17       A.    Sometimes everybody makes a mistake.

18       Q.    And, obviously, those times may have

19   to be negative, right?

20       A.    Right.

21       Q.    If I missed an appointment, if I'm

22   late somewhere, my client might say, "Dave, you

23   should have been on time," and that might be

24   negative --

25       A.    Uh-huh.

1    that they believed Carol Campbell was

2    performing well?

3         A.    Oh, yeah.

4         Q.    So she was able to, I guess, hoodwink

5    them into believing she was doing the right

6    thing?

7         A.    Oh, yeah.

8         Q.    Because what, she would always tell on

9    you guys?

10        A.    She's a tattletale.

11        Q.    Okay.

12        A.    She's a bully and a tattletale.  She

13   would go and make a list of things, and she

14   would put them in her desk drawer.  And then

15   when she could get one of those higher up

16   people, she would run in there and give them

17   that, and they listened to it.  And David

18   Brooks, he was the top on the list, that's the

19   one that --

20        Q.    Yeah.  And I guess with Carol, Carol

21   was almost your age, right?

22        A.    Uh-huh.

23        Q.    Yes?  Right?

24        A.    Yes, sir.

25        Q.    And Carol was also on medication for

1   depression?

2        A.    Yep.

3        Q.    Do you know if she was seeing a

4   psychiatrist regularly; did she tell you that?

5        A.    She's made some comment about it.   I

6   don't know if it was every week, but she said

7   she -- when we were just gabbing, it came out

8   she was also taking medication.

9        Q.    Okay.

10       A.    She had mood swings, highs and lows,

11   highs and lows.   Whoa.

12       Q.    So the two of you were -- I guess it

13   just came down to she would tattle and she

14   would go talk to the doctors?

15       A.    Yeah.   She was good at it.

16       Q.    She would say this is Toni or this is

17   Kathy who did this?

18       A.    Uh-huh.   Uh-huh.

19       Q.    Okay.

20       A.    Yep.

21       Q.    You and Toni didn't necessarily do

22   that?

23       A.    Didn't do it at all.   Unh-unh.

24       Q.    When they said the department isn't

25   performing well, Carol is pointing the finger

```
1    at you two and you two are getting disciplined?
2         A.    Disciplined, right.
3         Q.    I think your documents say that you
4    didn't keep any notes during your employment,
5    like a journal or anything like that?
6         A.    I probably did here and there, but I
7    was afraid to have them out because I didn't
8    know -- she would go through all our paperwork
9    and snoop around at everything we had.
10        Q.    Who, Carol?
11        A.    Yeah.   Carol did it.   Uh-huh.   We were
12   afraid to take a day off because she would go
13   through all the stacks of paperwork, and she
14   would keep them.   So with that, we had to be
15   very cautious.   I never left her any messages.
16        Q.    Today do you have any notes from your
17   employment, a journal or anything like that?
18        A.    I don't think so.
19        Q.    Okay.   You said that there was that
20   conversation in the hallway that you overheard
21   somebody --
22        A.    I did.
23        Q.    You never heard any other age comments
24   during your employment?
25        A.    No.   Just that one.   Yeah.
```

1     nothing ever came out of it.

2          Q.    What was Marcie Munson's role at UH?

3          A.    She was an attorney.

4          Q.    Did you hear back from her?

5          A.    Never.  Unh-unh.

6          Q.    And with regard to Plaintiff's Exhibit

7     9, if you could bring that in front of you.

8     I'm not sure where it is in the pile.  There it

9     is.

10         A.    Okay.

11         Q.    If you go to page 3, do you recognize

12    -- next page, ma'am.  Do you recognize the

13    handwriting at the top?

14         A.    Yes.

15         Q.    Whose is it?

16         A.    Mine.

17         Q.    And did you write this on or about

18    December 5th, 2013?

19         A.    Yes.

20         Q.    And you made a reference there about a

21    medical issue; do you see that, ma'am?

22         A.    "Any prior dissatisfaction could have

23    been related to the fact that I had a medical

24    issue, not aware of until noted by" -- that's

25    right.  They wouldn't honor it until I went to

110

```
 1    PIP -- I mean, until I went to Springer, that
 2    lady, Springer, and she told me that I should
 3    take time off until the Lithium started to work
 4    in my system.  I said that I'm afraid I would
 5    get fired if I left, and she said, no, they
 6    wouldn't, and I got fired anyway.
 7         Q.    And so when you were asked whether you
 8    had informed UH about your medical issue, you
 9    had mentioned 2008 and shortly before you were
10    fired?
11         A.    Right.
12         Q.    And does this refresh your
13    recollection as to when you told UH about your
14    medical issue?
15         A.    I told them every time she called me
16    in the room, every single time she called me in
17    there I told her the doctor's name and what was
18    being done for me, and she said, "That's your
19    problem, not mine."
20         Q.    You were asked to testify about the
21    PIP that you were placed on.  That's
22    Plaintiff's Exhibit 10.  Would you locate that,
23    ma'am?
24         A.    It's not that one.
25         Q.    This is it, ma'am, Plaintiff's Exhibit
```

1     Q.    And I think you testified it was

2  shortly thereafter that the conditions of your

3  employment had changed?

4     A.    Mine were going downhill drastically.

5  Uh-huh.

6     Q.    You also testified about Excel, ma'am;

7  do you recall that?

8     A.    Yes, I do.

9     Q.    And just for clarity purposes, when

10  did you obtain the CD with some kind of Excel?

11     A.    I bought that on my own, I think,

12  during the week that Deb Conti was reminding me

13  I had to learn, I had to use it, this, that and

14  the other. And I went out with my daughter to

15  one of these computer stores, and it was, I

16  think, $150 for the CD.  And I bought it and

17  started to look at it.

18     Q.    This was prior to your termination?

19     A.    Yes.

20     Q.    How long before your termination did

21  you obtain that CD?

22     A.    Several months before, I'm sure.

23  Uh-huh.

24     Q.    Have you worked with Excel since your

25  termination?

1     A.    Unh-unh.

2     Q.    I assume that you probably let people

3 know, because you're upset about the

4 performance improvement, I assume Carol

5 probably knew?

6     A.    She knew.

7     Q.    And if somebody is on a PIP, there's a

8 chance that you're going to be discharged,

9 right?

10     A.    I would think, yeah.

11     Q.    So it wasn't out of the question that

12 Carol would think that maybe your job was at

13 risk?

14     A.    Right.

15     Q.    If I asked Carol whether she thought

16 your performance was good or not, what do you

17 think she would say?

18          MR. PORTER:  Objection.

19     A.    I can't tell you.

20     Q.    You can't tell me?

21     A.    No.

22     Q.    Do you think that she told Deb and the

23 doctors that your performance was bad, that you

24 made mistakes?

25     A.    She always tried to make it sound like

EEOC FORM 131 (11/09)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Ms.  Heather Harmon<br>Human Resources Manager<br>3605 WARRENSVILLE CENTER ROAD<br>Shaker Heights, OH 44122<br><br>RECEIVED 3-13-15 | **Kathryn Fortunate** |
| | THIS PERSON (check one or both) |
| | [X]  Claims To Be Aggrieved |
| | [ ]  Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**532-2015-00360** |

### NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[ ] Title VII of the Civil Rights Act (Title VII)   [ ] The Equal Pay Act (EPA)   [X] The Americans with Disabilities Act (ADA)

[X] The Age Discrimination in Employment Act (ADEA)   [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by 13-APR-15 a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by to the enclosed request for information and send your response to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources.  If you would like to participate, please say so on the enclosed form and respond by   **25-MAR-15**
to   **Deanna R. Jackson, ADR Staff Mediator, at  (216) 522-7415**
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above.  Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| **Leona J. Smith,**<br>**Acting Intake Supervisor** | **Cleveland Field Office**<br>EEOC, AJC Fed Bldg |
|---|---|
| *EEOC Representative* | **1240 E 9th St, Ste 3001** |
| *Telephone*    **(216) 522-7515** | **Cleveland, OH 44199**<br>**Fax: (216) 522-7395** |

Enclosure(s):  [X]  Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] Race  [ ] Color  [ ] Sex  [ ] Religion  [ ] National Origin  [X] Age  [X] Disability  [ ] Retaliation  [ ] Genetic Information  [ ] Other

**See enclosed copy of charge of discrimination.**

| Date<br><br>March 11, 2015 | Name / Title of Authorized Official<br><br>**Connie Davis,**<br>**Supervisory Investigator** | Signature<br><br>*Connie Davis* |
|---|---|---|

DEFENDANT'S
EXHIBIT
2
6-28-16

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | AMENDED  532-2015-00360 |

| Ohio Civil Rights Commission | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Kathryn Fortunate** | **(216) 249-7228** | Redacted |

| Street Address | City, State and ZIP Code |
|---|---|
| **15620 Holliday Avenue, Cleveland, OH 44110** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **UNIVERSITY HOSPITALS HEALTH SYSTEM** | **500 or More** | **(216) 844-3144** |

| Street Address | City, State and ZIP Code |
|---|---|
| **11100 Euclid Ave,  Cleveland, OH 44106** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

FEB 19 2015

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest  Latest |
| ☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | **10-29-2014  10-29-2014** |
| ☐ RETALIATION  ☒ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION  ☐ OTHER *(Specify)* | ☐ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

In March of 2003 I was hired by the Respondent as a Secretary. On October 29, 2014 I was discharged. I have a disability.

I believe that Deb Conti (Supervisor) discriminated against me when I asked to perform duties that I had not been trained on.  Due to my disability I was not performing at an acceptable level. I was placed on a PIP in 2013. In October of 2014 I advised my supervisor that I had a disability.

I believe that I was discharged due to my disability in violation of Title I of the Americans with Disabilities Act of 1990 as amended ADA. I believe that I was discriminated against because of my age (67) in violation of the Age Discrimination in Employment Act of 1967 as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT |
| 2-9-15 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| Date      Charging Party Signature | |

Email: Jennifer.levin@uhhospitals.org

### University Hospitals Medical Group, Inc.

September 9, 2008

Baha Arafah, M.D.
Dept. of Endocrinology
Lakeside, 8th Floor
11100 Euclid Ave.
Cleveland, Ohio 44106


Dear Dr. Arafah,

This letter is to confirm that Ms. Kathryn Fortunato is under my care for the treatment of an anxiety disorder. She will be undergoing cognitive behavior therapy twice monthly.


Sincerely,


Jennifer B. Levin, Ph.D.
Clinical Psychologist

DEFENDANT'S
EXHIBIT
4
10-2876
PENGAD 800-631-6888

**UniversityHospitals HealthSystem**

**Application for Employment**
Jobline - (888) 844-3085

- ☐ Bedford Medical Center
  Bedford, Ohio
- ☐ Brown Memorial Hospital
  Conneaut, Ohio
- ☐ Enterprise Staffing Services
  Cleveland, Ohio
- ☐ Geauga Regional Hospital
  Chardon, Ohio
- ☐ Home Care Services, Inc.
  Warrensville Hts., Ohio
- ☐ Laurelwood Hospital &
  Counseling Centers
  Willoughby, Ohio
- ☐ Memorial Hospital of Geneva
  Geneva, Ohio
- ☐ One-to-One Fitness Center
  Cleveland, Ohio
- ☐ QualChoice Health Plan
  Mayfield Hts., Ohio
- ☐ University CompCare
  Cleveland, Ohio
- ☐ University Hospitals
  Faculty Services
  Mayfield Hts., Ohio
- ☐ University Hospitals of Cleveland
  Cleveland, Ohio
- ☐ University Hospitals Management
  Services Organization
  Cleveland, Ohio
- ☐ University Laboratory
  Services Foundation
  Cleveland, Ohio
- ☐ University MedNet
  Euclid, Ohio

☐ Other _____

**POSITION INFORMATION**

POSITION APPLIED FOR: _Medical Secretary_   DESIRED RATE OF PAY $ _12.50_ PER _hr +_

DATE AVAILABLE TO BEGIN EMPLOYMENT: _ASAP_

CHECK ALL EMPLOYMENT CONDITIONS YOU ARE AVAILABLE FOR:
- ☑ FULL TIME
- ☐ PART TIME
- ☐ PRN
- ☐ DAY
- ☐ EVENING
- ☐ NIGHT
- ☐ DAY/EVENING ROTATION
- ☐ DAY/NIGHT ROTATION
- ☐ DAY/EVENING/NIGHT ROTATION
- ☐ WEEKEND
- ☐ ON CALL
- ☐ TEMPORARY WORK

NURSING SPECIALTY AREAS OF INTEREST:
- ☐ ADULT ICU
- ☐ EMERGENCY
- ☐ HOMECARE
- ☐ MEDICAL/SURGICAL
- ☐ OB/GYN
- ☐ ONCOLOGY
- ☐ PEDIATRIC ICU
- ☐ PEDIATRICS
- ☐ PSYCHIATRY
- ☐ SKILLED NURSING
- ☐ SURGERY
- ☐ TELEMETRY

**PERSONAL DATA**

LAST NAME _Fortunato_   FIRST _Kathryn_   MIDDLE ___

EMPLOYED UNDER ANY OTHER NAME ___

PERMANENT ADDRESS   NUMBER AND STREET _15020 Halliday Ave_

CITY _Cleveland, Ohio_   STATE   ZIP _44110_

TELEPHONE NUMBER _(216) 249-7228_

SOCIAL SECURITY NO.: Redacted

PRESENT ADDRESS IF DIFFERENT FROM ABOVE   NUMBER AND STREET ___

CITY ___   STATE ___   ZIP ___

TELEPHONE NUMBER ( )

ARE YOU AT LEAST 18 YEARS OLD? ☑ YES ☐ NO
ARE YOU A U.S. CITIZEN OR OTHERWISE LEGALLY ELIGIBLE TO WORK IN THE U.S.? ☑ YES ☐ NO
BY LAW, ALL PERSONS ARE REQUIRED TO PROVIDE DOCUMENTATION ESTABLISHING IDENTITY AND EMPLOYMENT AUTHORIZATION UPON HIRE.

HAVE YOU EVER APPLIED AT UNIVERSITY HOSPITALS HEALTH SYSTEM (INCLUDING ANY SUBSIDIARIES) BEFORE? ☑ YES ☐ NO
IF YES, WHEN? ___ LOCATION APPLIED ___ WHAT POSITION? ___

HAVE YOU PREVIOUSLY BEEN ON THE PAYROLL OF UNIVERSITY HOSPITALS HEALTH SYSTEM (INCLUDING ANY SUBSIDIARIES)? ☐ YES ☑ NO
IF YES, WHEN? ___ LOCATION EMPLOYED ___ POSITION? ___

ARE YOU RELATED TO ANYONE IN UHHS? ☐ YES ☑ NO   LOCATION ___
IF YES, WHOM? ___ RELATIONSHIP ___

NAME ACQUAINTANCES IN OUR EMPLOY: _Chas Darling - Radiology / Dr Fiocchi-GI_   LOCATION: ___

HOW DID YOU HEAR OF THE POSITION? (Check Only One)
- ☑ JOB POSTING
- ☐ UH REPUTATION
- ☐ JOB LINE
- ☐ RECRUITER
- ☐ NEWSPAPER (Name) ___
- ☐ EMPLOYEE REFERRAL
- ☐ EMPLOYMENT AGENCY
- ☐ PHONE DIRECTORY
- ☐ WEBSITE
- ☐ SCHOOL (NAME) ___
- ☐ JOB FAIR (NAME) ___
- ☐ RADIO
- ☐ OTHER ___

CONVICTION RECORD:
HAVE YOU EVER BEEN CONVICTED OF A VIOLATION OF A LAW OTHER THAN A MINOR TRAFFIC VIOLATION? ☐ YES ☐ NO
IF YES EXPLAIN:

CONVICTION OF A CRIME WILL NOT NECESSARILY DISQUALIFY AN APPLICANT FROM EMPLOYMENT. FAILURE TO INDICATE A CONVICTION, REGARDLESS OF THE RECENCY OR SEVERITY, WILL BE CONSIDERED A FALSIFICATION OF THE EMPLOYMENT APPLICATION, WHICH IS A DISQUALIFIER FROM FURTHER CONSIDERATION, AND IF ALREADY HIRED, IS GROUNDS FOR IMMEDIATE DISMISSAL.

UHS-010 12/98

**AN EQUAL OPPORTUNITY EMPLOYER**

SP-1445 (12/3/98)

Left margin handwriting: POSITION (1) Med Secretary POSITION (2) ___   DATE 5/10/01   FIRST Kathryn   LAST NAME Fortunato

List present or most recent employer first   INCLUDE ALL EMPLOYMENT FOR PAST 10 YEARS
*A resume is not a substitute for the employment application.*

**COMPANY NAME:** University Hospitals
**PHONE NUMBER & EXT:** (844)-1446

**ADDRESS (NUMBER, STREET, CITY, STATE, ZIP):** 11100 Euclid Ave.

**JOB DUTIES:** Medical Secretary To Joseph Krall + Bartolo Giannatasio. Phones Transcription Scheduling Testing Paging Dist. Filing Pulling Records - Obtaining Records on Pts.

**SUPERVISOR NAME & TITLE:** Vicki Pozzuto MGR

**MAY WE CONTACT YOUR PRESENT EMPLOYER?** ☑ YES ☐ NO

**DATES OF EMPLOYMENT**
FROM: OCT 2000 (MONTH & YEAR)  TO: MAY 2001 (MONTH & YEAR)

**JOB TITLE:**

☐ FULL TIME ☐ PART TIME ☐ TEMPORARY ☐ PRN

**REASON FOR LEAVING:** Temp Assignment

**SALARY** START $12.50 PER  END $12.50 PER

---

**COMPANY NAME:** Univ Hospitals
**PHONE NUMBER & EXT:** (216)

**ADDRESS (NUMBER, STREET, CITY, STATE, ZIP):** 11100 Euclid Ave

**JOB DUTIES:** Medicals secretary For Dr. Cooper, Katz, Sivak Dept of ENT. Then Trans'd to Dr. Fiocchi.

**SUPERVISOR NAME & TITLE:** Avery Got Fired

**DATES OF EMPLOYMENT**
FROM: 5-00 (MONTH & YEAR)  TO: 10-00. (MONTH & YEAR)

**JOB TITLE:** Medical Sec.

☐ FULL TIME ☐ PART TIME ☐ TEMPORARY ☐ PRN

**REASON FOR LEAVING:** Funding, Temp Assignment only

**SALARY** START $ PER  END $ PER

---

**COMPANY NAME:** UH-Lander Brook
**PHONE NUMBER & EXT:** 1-440-646-2200

**ADDRESS (NUMBER, STREET, CITY, STATE, ZIP):**

**JOB DUTIES:** Lander Brook - Dr. Deatly, Orringer Dr. David Rosenburg. Medical Sec.

**SUPERVISOR NAME & TITLE:** Chris Johnson

**DATES OF EMPLOYMENT**
FROM: (MONTH & YEAR)  TO: (MONTH & YEAR)

**JOB TITLE:**

☐ FULL TIME ☐ PART TIME ☐ TEMPORARY ☐ PRN

**REASON FOR LEAVING:** Temp Assign

**SALARY** START $11.50 PER  END $12.57 PER

---

**COMPANY NAME:** Univ Hospitals - Echo Lab
**PHONE NUMBER & EXT:** 216 844 43825

**ADDRESS (NUMBER, STREET, CITY, STATE, ZIP):** 11100 Euclid Ave

**JOB DUTIES:** Phones, Typing, Filing, Faxing ETC

**SUPERVISOR NAME & TITLE:** Jayne Trayte

**DATES OF EMPLOYMENT**
FROM: 1-1999 (MONTH & YEAR)  TO: 6-1999 (MONTH & YEAR)

**JOB TITLE:**

☐ FULL TIME ☐ PART TIME ☐ TEMPORARY ☐ PRN

**REASON FOR LEAVING:** Temp Postion - Lack of Funds

**SALARY** START $ PER  END $ PER

**EMPLOYMENT HISTORY**

## PROFESSIONAL EMPLOYMENT REFERENCES NOT ALREADY LISTED (NO RELATIVES)

**REFERENCES**

| NAME | OCCUPATION / TITLE - RELATIONSHIP | DAYTIME PHONE # |
|---|---|---|
| Bartolo Gianna Hasid | Dept Cardiology - EP | (214) 844-7120 |
| Claudio Frocchi MD | Dept GI | (216) 368-1668 |
| Jeanette Rhynier | Business Mgr PEDS Neuro | 216 844-1607 |
| Joseph Niati | Dept Cardiology | 216 844-1446 |

**PROFESSIONAL LICENSURE**

TYPE OF LICENSURE/CERTIFICATION _____ STATE _____

LICENSE/CERTIFICATE NUMBER _____ EXPIRATION DATE _____

TYPE OF LICENSURE/CERTIFICATION _____ STATE _____

LICENSE/CERTIFICATE NUMBER _____ EXPIRATION DATE _____

**SPECIAL TRAINING / SKILLS**

CHECK ALL APPLICABLE SKILLS/TRAINING

- ☐ ACCOUNTING
- ☐ ACCOUNTS PAYABLE/RECEIVABLE
- ☐ BILLING
- ☐ BUDGETARY RESPONSIBILITY
- ☐ CAD (COMPUTER AIDED DESIGN)
- ☐ CODING (ICD-9, CPT)
- ☐ CRT/DATA ENTRY
- ☒ CUSTOMER SERVICE
- ☐ DATABASES
- ☐ DESKTOP PUBLISHING
- ☐ E-MAIL

- ☐ IBM PC OR COMPATIBLE
- ☐ INFUSION/IV THERAPY
- ☐ INTERNET
- ☐ LAN (LOCAL AREA NETWORK)
- ☐ MACINTOSH
- ☒ MEDICAL TERMINOLOGY
- ☐ PHLEBOTOMY
- ☐ PROGRAMMING
- ☐ PROOFREADING
- ☐ SPREADSHEET
- ☐ SPSS/SAS STAT SOFTWARE

- ☐ SUPERVISORY TRAINING
- ☐ STERILIZATION TECHNIQUES
- ☐ TIME MANAGEMENT TRAINING
- ☒ TRANSCRIPTION (MEDICAL)
- ☐ TRANSCRIPTION (NON-MEDICAL)
- ☐ TYPING 70 WPM
- ☐ WINDOWS 3.1
- ☒ WINDOWS 95
- ☒ WORD PROCESSING
- ☐ WAN (WIDE AREA NETWORK)

LIST SOFTWARE PROFICIENCIES: _____

PLEASE LIST OTHER SPECIAL TRAINING OR SKILLS: _____

ADDITIONAL TRAINING:

ACLS _____ (Exp. Date)    CCRN _____ (Exp. Date)    Other _____ (Exp. Date)

BCLS _____ (Exp. Date)    ANA _____ (Exp. Date)    Other _____ (Exp. Date)

IF THE POSITION REQUIRES DRIVING, DO YOU HAVE A VALID DRIVER'S LICENSE? ☐ YES ☐ NO   DRIVER'S LICENSE # AND STATE ISSUED _____

**U.S. MILITARY SERVICE**

ARMED FORCES RECORD

PRESENT CLASSIFICATION: _____    BRANCH: _____

NATURE OF DUTIES: _____    HIGHEST RANK: _____

UHPS000269

It is the Policy of University Hospitals Health System (UHHS) to provide equal opportunity to all of our employees and applicants for employment. Decisions concerning employment, transfers and promotions or other conditions of employment are all made upon the basis of the best qualified candidate without regard to color, race, religion, national origin, age, sex, disability, ancestry or status as a disabled or Vietnam era veteran.

It is also a policy of UHHS to provide a drug-free work place and to endeavor to provide for the safety and well-being of all its employees, patients and visitors. Use of drugs or alcohol while on the job, on company premises or company business or being under their influence at any such time is strictly prohibited.

I hereby certify that all answers and statements made on this application are complete and true to the best of my knowledge. I understand that any misleading statement, misrepresentation, and/or omission of information may cause this application to be rejected or be cause for termination of employment. I further understand that notwithstanding any offer of employment which may follow this application, final employment will be based on completion of all UHHS's pre-employment requirements and procedures including interview(s), reference checks, verifications, an employment entrance examination by an employee health clinic, and other appropriate procedures deemed necessary. I am hereby specifically aware of, understand and agree to the following:

- A post job offer medical examination, including drug testing, will be required. I understand that any job offer is contingent upon successful completion of the medical examination and the drug screen and I agree to provide access to previous medical records if reasonably required.

- During my employment, if I am hired, I will submit myself to medical examinations to determine my fitness to perform my job in the interest of my safety and well-being and that of UHHS, its patients, visitors and other employees. These examinations may include testing for drugs and/or alcohol, as often as requested during my employment where reasonable suspicion of their use or dependency may exist.

- I further understand and agree that the failure of UHHS to request any such physical examination shall not be construed as an admission by UHHS that I am physically qualified to perform any specific type of service.

- Refusal to submit to an alcohol and/or drug testing in accordance with UHHS policy at any time may result in immediate discharge. I also understand that failure to pass an alcohol or drug test at any time during employment may result in corrective action up to and including immediate discharge.

- UHHS is a "smoke-free" work place and, as such, smoking is prohibited throughout the interior premises of UHHS.

- My criminal record may be examined in connection with your consideration of this application or in the future during my employment and I hereby authorize any lawful examination of my criminal record. A conviction of a violation of a law other than a minor traffic violation occurring prior to or following commencement of employment may result in action up to and including discharge.

- I authorize organizations and persons to give information about me and I hereby release them from all liability for honesty responding to inquiries from UHHS about me.

- I will observe all rules, regulations, policies, and procedures as they relate to UHHS employees as adopted or amended from time-to-time. I understand that such rules are adopted for specific and important reasons and violation of these can subject me to corrective action up to and including discharge. I agree that I will familiarize myself with all such rules and policies and ask questions of my supervisor or the Human Resource Department whenever I do not understand anything about them.

- My employment will be at-will, and not for any specific period of time, will not constitute an employment contract, and that either I or UHHS will be free to terminate the relationship at anytime for any reason. I also understand and agree that no one has authority to vary this understanding except in writing directed to me and signed by an authorized officer of UHHS.

- I will be bound by these same provisions irrespective of the affiliate of University Hospitals Health System to which I am applying to work or to which I may be transferred.

**I HAVE READ AND UNDERSTAND THE ABOVE AND AGREE TO BE ABSOLUTELY BOUND BY THIS.**

_Kathryn Foslube_
(Signature)

5-9-01
(Date)

**AN EQUAL OPPORTUNITY EMPLOYER**

**FOR HUMAN RESOURCES USE ONLY**

STARTING DATE 5-21-01          POSITION Doctor Secy I          STATUS RFT

EXPENSE CENTER _____          DEPT. Ophthalmology          HOURS/WEEK 40

TEMPORARY EMPLOYMENT:          FROM: _____          TO: _____

SHIFT D          RATE OF PAY: $ 13.00 per hr

COMMENTS Voucher # 97355

SIGNED _RC_

Interviewed by _RC_          Date 5/9/01

## Summary of Corrective Actions from 2001 - 2011

**7/23/01** – Fortunato issued a PIP for inaccuracy/incompleteness in her doctor's schedule, missing patient charts, telephone messages missing important details, failure to turn around transcription within 24 hours, patient appointments not added to the IDX system, and failure to change her internal voice mail message despite repeated requests.

**9/21/01** – Fortunato issued a PIP for inaccuracy/incompleteness in her doctor's schedule, failure to remind patients of appointments 24 hours in advance, and failure to work with the file room to ensure all patient files have necessary charts and photos.

**1/29/02** – Fortunato issued a corrective action for her continued failure to: remind patients of appointments in advance; add patient appointments to the IDX system; include important details when recording communications with patients; and keep an accurate/complete schedule for her doctor.  Additionally, Fortunato was failing to turn her timecards in on time.

**2/19/02** – Fortunato received a two week follow-up to her 1/29/02 corrective action. Fortunato was still failing to appropriately maintain IDX schedules, turn in her timecards in a timely manner, and take detailed notes of patient communications.

**6/23/10** – Fortunato received a corrective action (confirmation of counseling) for failing to provide lab results to physicians within 24 hours to ensure proper patient care.

**7/28/10** – Fortunato received a corrective action (warning) for failing to complete "clinic change forms" which resulted in clinics remaining open which should have been closed.  This caused 35 patient appointments to be bumped and the appointments could not be rescheduled for 3-4 weeks.

**7/28/10** – Fortunato received a corrective action (final warning/suspension) for her continued failure to properly complete "clinic change forms."  Additionally, Fortunato was not responding to email in a timely fashion.



DEFENDANT'S
EXHIBIT
7
6-28-16

PENGAD 800-631-6989

 **University Hospitals**

**UH Performance Evaluation**
ASSOCIATE & PROFESSIONAL

| Employee (print name): | Kathryn Fortunato | Department: | Medicine |
|---|---|---|---|
| Date: | 8/19/14 | Title: | Secretary Medical |

# 1 Goals

| Major Goals (start of year) | Measurements/Observations (end of year) |
|---|---|
| • Excellent customer service<br>• Learn & implement Athena & AEMR<br>• Continue to improve operations in Endocrinology administrative offices | • Feedback from patients, providers, and co-workers<br>• Successful implementation & accurate use of both systems<br>• Consistently involved in managing transition from paper to electronic chart |

# 2 Job-Specific Competencies (attach job specific competencies if applicable)

Assess which competencies have been met and how the employee can develop the competencies that need improvement.

| Does Not Meet Expectations | ☒ | Meets Expectations | ☐ |
|---|---|---|---|

| Recommendations for improvement |
|---|
| See competencies |

# 3 UH Values

| UH Values | Evaluation |
|---|---|
| **Excellence**<br><br>We have a continuous drive for excellence and are always seeking ways to improve the health of those who rely on us.<br><br>Observable Behaviors<br><br>• Sets standards for excellence—Establishes criteria and/or work procedures to achieve a high level of quality, productivity, or service.<br><br>• Ensures high quality—Dedicates required time and energy to assignments or tasks to ensure that no aspect of the work is neglected; works to overcome obstacles to completing tasks or assignments. | ☐ Consistently Exceeds Expectations<br>☐ Consistently Meets Expectations<br>☐ Frequently Meets Expectations<br>☒ Does Not Meet Expectations<br><br>*Observations / Recommendations:*<br><br>Struggles with using Athena, UHAmbulatory and UHScan in an efficient and effective manner.  Work area is unorganized and unclean; difficulty staying on task |
| **Diversity**<br><br>We embrace diversity in people, ideas, experiences and perspectives. | ☐ Consistently Exceeds Expectations<br>☐ Consistently Meets Expectations<br>☐ Frequently Meets Expectations<br>☒ Does Not Meet Expectations |

DEFENDANT'S EXHIBIT
8
6-28-16

 **University Hospitals**

**UH Performance Evaluation**
ASSOCIATE & PROFESSIONAL

| Observable Behaviors | Observations / Recommendations: Making inappropriate comments about fellow coworkers that can be misconstrued as derogatory, and not in line with our effort to establish relationships based on embracing diversity. |
| --- | --- |
| • *Seeks understanding—Establishes relationships with and learns more about people of other cultures and backgrounds (i.e., their special issues, social norms, decision-making approaches, and preferences).*<br><br>• Uses diversity as an advantage—Seeks out and uses ideas, opinions, and insights from diverse sources. | |



 **University Hospitals**

**UH Performance Evaluation**
ASSOCIATE & PROFESSIONAL

| | |
|---|---|
| **Integrity**<br><br>We have a shared commitment to do what is right.<br><br>Observable Behaviors<br><br>- Stays true to self—Acts in accordance with one's own values, standards, and beliefs even when under pressure; ensures that words and actions are consistent across situations.<br><br>- *Acts with integrity—Adheres to moral, ethical, and professional standards, regulations, and organizational policies; keeps commitments to promised actions.* | ☐ Consistently Exceeds Expectations<br>☐ Consistently Meets Expectations<br>X Frequently Meets Expectations<br>Does Not Meet Expectations<br><br>*Observations / Recommendations:*<br>I appreciate that you taking accountability for errors you have made. |
| **Compassion**<br><br>We have genuine concern for those in our community and treat them with respect and empathy.<br><br>Observable Behaviors<br><br>- *Conveys respect—Uses language and behavior that consistently reflect and enhance the dignity of diverse patients, partners, and employees; takes actions that show consideration for cultural concerns and expectations; continually examines own biases and behaviors to avoid stereotypical responses.*<br><br>- Maintains relationships—Presents a positive disposition and maintains constructive interpersonal relationships even when under stress. | ☐ Consistently Exceeds Expectations<br>☐ Consistently Meets Expectations<br>☐ Frequently Meets Expectations<br>☒ Does Not Meet Expectations<br><br>*Observations / Recommendations:*<br>While you are empathetic and show compassion to our patients, your interactions with your co-workers do not express that same level of compassion and empathy. Co-workers are an extension of the patient care community. |
| **Teamwork**<br><br>We work collaboratively as an integrated team to improve patient care and performance.<br><br>Observable Behaviors<br><br>- Informs others on team—Shares important or relevant information with the team.<br><br>- *Models commitment—Adheres to the team's expectations and guidelines; fulfills team responsibilities; demonstrates personal commitment to the team.* | ☐ Consistently Exceeds Expectations<br>☐ Consistently Meets Expectations<br>☒ Frequently Meets Expectations<br>☐ Does Not Meet Expectations<br><br>Observations / Recommendations:<br>With tasks that you feel are a part of your job, it will help. It is important to contribute to a team environment and help co-workers with clerical duties, patient follow-up, chart scanning. In a collaborative working environment the "its not my job mentality" is unacceptable. |

 **University Hospitals**

# UH Performance Evaluation
## ASSOCIATE & PROFESSIONAL

## 4 UH Core Behaviors

| UH Core Behaviors | Evaluation |
|---|---|
| **Managing Work (includes Time Management)**<br>Effectively managing one's time and resources to ensure that work is completed efficiently.<br><br>Observable Behaviors<br><br>• Prioritizes—Identifies more critical and less critical activities and tasks; adjusts priorities when appropriate.<br><br>• Makes preparations—Ensures that required equipment and/or materials are in appropriate locations so that own and others' work can be done effectively.<br><br>• Schedules— Effectively allocates own time to complete work; coordinates own and others' schedules to avoid conflicts.<br><br>• Leverages resources—Takes advantage of available resources (individuals, processes, departments, and tools) to complete work efficiently.<br><br>• Stays focused—Uses time effectively and prevents irrelevant issues or distractions from interfering with work completion. | ☐ Consistently Exceeds Expectations<br>☐ Consistently Meets Expectations<br>☐ Frequently Meets Expectations<br>☒ Does Not Meet Expectations<br><br>*Observations / Recommendations:*<br>In May of 2013 you were supporting 1 FT physician, your physician reported the following concerns:<br>• Not opening/closing clinic schedule in a timely manner<br>• Cancelled patients were not notified and arrived for scheduled appointments<br>• Physician reported that patients calls were going unanswered<br>• Scheduling patient appointments t at incorrect locations<br>• Unapproved overbooking for physician |
| **Applied Learning**<br>Assimilating and applying new job-related information in a timely manner.<br><br>Observable Behaviors<br><br>• *Actively participates in learning activities—Takes part in needed learning activities in a way that makes the most of the learning experience (e.g., takes notes, asks questions, does required tasks).*<br><br>• Quickly gains knowledge, understanding, or skill—Readily absorbs and comprehends new information from formal and informal learning experiences.<br><br>• Applies knowledge or skill—Puts new knowledge, understanding, or skill to practical use on the job; furthers learning through trial and error. | ☐ Consistently Exceeds Expectations<br>☐ Consistently Meets Expectations<br>☐ Frequently Meets Expectations<br>☒ Does Not Meet Expectations<br><br>*Observations / Recommendations:*<br>• Athena Go-Live on May 20, 2014, training dates were scheduled pre-go live dates; you did not attend the training.  I registered you for training on June 4, 2013 post go-live and you were sent to retraining on Oct 9 2013.<br>• EMR Go-Live Sept 23 you received training in Aug. You were still preparing new patient charts and adding documentation post go live through the paper chart process, you were retrained Dec 12. |
| **Building Trust**<br>Interacting with others in a way that gives them confidence in one's intentions and those of the organization.<br><br>Observable Behaviors<br><br>• Operates with integrity—Demonstrates honesty; keeps commitments; behaves in a consistent manner. | ☐ Consistently Exceeds Expectations<br>☐ Consistently Meets Expectations<br>☐ Frequently Meets Expectations<br>☒ Does Not Meet Expectations<br><br>*Observations / Recommendations:*<br>• The high number of errors has resulted in the physicians you support to |

UHPS000312

 **University Hospitals**

# UH Performance Evaluation
### ASSOCIATE & PROFESSIONAL

| | |
|---|---|
| • Discloses own positions—Shares thoughts, feelings, and rationale so that others understand personal positions. | reach out to me or another secretary to get task accomplished |
| • *Remains open to ideas—Listens to others and objectively considers others' ideas and opinions, even when they conflict with one's own.* | |
| • *Supports others—Treats people with dignity, respect, and fairness; gives proper credit to others; stands up for deserving others and their ideas even in the face of resistance or challenge.* | |

| | |
|---|---|
| **Patient/Colleague Relations**<br><br>Meeting patient, patient family, and colleague needs; taking responsibility for a patient's safety, satisfaction, and clinical outcomes; using appropriate interpersonal techniques to resolve difficult situations and regain patient, patient family, and colleague confidence.<br><br>**Observable Behaviors**<br><br>• Seeks to understand patient/colleague needs—Actively seeks information to understand circumstances, problems, expectations, and needs; verifies understanding.<br><br>• Meets or exceeds patient/colleague needs—Quickly responds to patient/colleague needs; takes opportunities to exceed patient/colleague needs but avoids over-commitments; gains patient/colleague agreement to proposed solutions.<br><br>• *"HEARTS"—Handles upset patients and patient families by Hearing, Empathizing, Apologizing, Responding, Thanking, and Sending.*<br><br>• Cultivates patient/colleague relationships—Promotes honest and open communication with patients/colleagues; involves patient/colleagues in discussions, listens actively and maintains patient/colleague self-esteem.<br><br>• Educates patients (clinical only)—Shares information with patients and their families to build understanding of available healthcare services, options, risks, and ways to attain optimum health; manages patient expectations. | ☐ Consistently Exceeds Expectations<br>☐ Consistently Meets Expectations<br>☐ Frequently Meets Expectations<br>☒ Does Not Meet Expectations<br>*Observations / Recommendations*<br>• Not providing pertinent Information in messages for physicians including date of message, DOB ,MRN and phone numbers<br>• Patient Complaint calls because messages are not being forwarded to physician<br>• Not using proper greeting when answering calls<br>• High numbers of scheduling errors, resulting in reassignment of work load to other secretaries |
| **Employee promotes the Code of Conduct.** | ☒ Yes ☐ No |
| | *Observations / Recommendations:* |
| **Employee adheres to the Code of Conduct.**<br><br>*\*In order to be eligible for a "Consistently Exceeds Expectations" rating, the employee must promote and adhere to the Code of Conduct.* | ☒ Yes ☐ No |
| | *If no, please explain:* |

UHPS000313

 **University Hospitals**

**UH Performance Evaluation**
ASSOCIATE & PROFESSIONAL

## 5 Evaluate Overall Performance

**Performance Summary**

Overall, Kathryn has struggled with implementing training she received on new systems, effective communication skills, workflow efficiency and time management.  Kathryn has attended retraining on all new systems.  We have discussed ways to improve her communication, follow-up and time management skills. In Oct/Nov Kathryn's work duties were reassigned to co-workers and she was re-assigned to a filing project. This caused significant disruption to operations and employee morale.  To assist with Kathryn's overall performance she will be placed on a Performance Improvement Plan.

**Overall Performance Rating**

☐ Too New (< 6 months)

| ☒ Does Not Meet Expectations | ☐ Frequently Meets Expectations | ☐ Consistently Meets Expectations | ☐ Consistently Exceeds Expectations |
|---|---|---|---|
| • The employee infrequently demonstrated job-specific competencies.<br>• The employee infrequently demonstrated UH Values and Core Behaviors.<br>• Few desired results were achieved. | • The employee frequently demonstrated job-specific competencies.<br>• The employee frequently demonstrated UH Values and Core Behaviors.<br>• Many desired results were achieved. | • The employee consistently demonstrated job-specific competencies.<br>• The employee consistently demonstrated UH Values and Core Behaviors.<br>• Most desired results were achieved. | • The employee consistently demonstrated job-specific competencies – usually beyond expectations.<br>• The employee consistently demonstrated UH Values and Core Behaviors – usually beyond expectations.<br>• Most desired results were achieved – usually beyond expectations. |

**Employee Comments**

## 6 Development Opportunities

- Successfully implement the performance recommendations in your PIP
- When an error is identified look for ways proactively provide solution
- Improvement of computer skills; increase knowledge and usage of Athena and EMR systems to reduce scheduling errors/conflicts
- Create and use your own tracking tools or (department tools) to improve time management and follow-up skills
- Use a collaborative approach to build trust with your co-workers and physicians you support

**Employee Signature** *Kathryn Fortune* **Manager Signature**

UHPS000314

 **University Hospitals**

**UH Performance Evaluation**
ASSOCIATE & PROFESSIONAL

| Date | / / | Manager Print Name: | Deb Conti |
|------|-----|---------------------|-----------|

PLEASE SEND TO HUMAN RESOURCES

**Performance Management Tool**

Department:  Medicine
Job Title: Secretary Medical

Name: Kathryn Fortunato
Year of Review: 2013

*List reason under comment section if competency was not met.*

1.  **Competency: Initiate and maintain positive relationships with patients/customers.**

|  | MET | NOT MET | COMMENTS |
|---|-----|---------|----------|
| A.  **Exemplify the UH Service Standards:**<br>○ Smile and be friendly<br>○ Focus on the patient<br>○ Respect others<br>○ Be courteous<br>○ Respond quickly, explain delays<br>○ Be helpful<br>○ Adheres to dress code and maintains good personal hygiene |  | X | Seems overwhelmed and distracted most of the time. |
| B.  **Ensure privacy & confidentiality for patients/customers.** | X |  |  |
| C.  **Know who all their customers are.** | X |  |  |
| D.  **Communicate at the patient/customer's level of education and experience.** |  | X | Struggles with understanding the needs of the patients. |
| E.  **Demonstrate empathy for the patient/customer's situation and concerns.** |  | X | Struggles with understanding the needs of the patients. |
| F.  **Act as an advocate for the patient/customer.** |  | X | Struggles with understanding the needs of the patients. |
| G.  **Maintain professional behavior consistent with role.** |  | X | Seems overwhelmed and distracted most of the time. |
| H.  **Maintain composure under difficult conditions.** |  | X | Seems overwhelmed and distracted most of the time. |
| I.  **Include the patient/customer's perspective in decision making and problem solving.** |  | X | Struggles with understanding the needs of the patients. |
| J.  **Demonstrate excellence in patient/customer relationships with observable examples.** |  | X | Seems overwhelmed and distracted most of the time. |

 **University Hospitals**

**UH Performance Evaluation**
ASSOCIATE & PROFESSIONAL

2. **Competency: Initiate and maintain positive relationships with co-workers.**

| | MET | NOT MET | COMMENTS |
|---|---|---|---|
| A. Take ownership of tasks and assignments. | | X | Seems overwhelmed and distracted most of the time. |
| B. Focus on what can be done, not what can't be done. | | X | Seems overwhelmed and distracted most of the time. |
| C. Speak positively of other employees, avoids negative gossip. | | X | Has made inappropriate comments about co-workers. |
| D. Help without being asked. | X | | |
| E. Follow through. | | X | Seems overwhelmed and distracted most of the time. |
| F. Share information and knowledge. | | X | |
| G. Give feedback positively to ensure service excellence. | | X | |
| H. Listen to and builds on other's ideas. | | X | |
| I. Model excellence and encourages others to excel. | | X | |
| J. Demonstrate excellence in relationships with co-workers. | | X | |

UHPS000316

 **University Hospitals**

**UH Performance Evaluation**
ASSOCIATE & PROFESSIONAL

**3. Competency: Take responsibility for self-development and supports a learning environment.**

|  | MET | NOT MET | COMMENTS |
|---|---|---|---|
| A. Accept feedback as an opportunity for growth. | X |  |  |
| B. Regularly participate in informal and formal education, staff meetings or staff development activities. | X |  |  |
| C. Apply knowledge gained from educational activities to work. |  | X |  |
| D. Is receptive to new ideas and improvement efforts. | X |  |  |
| E. Is responsive to new ways of learning. |  | X |  |
|  |  |  |  |
|  |  |  |  |

V1.0112012

UHPS000317

 **University Hospitals**

**UH Performance Evaluation**
ASSOCIATE & PROFESSIONAL

**4. Competency:** Demonstrates excellent communication skills

**Performance Expectations & Metrics**

| | MET | NOT MET | COMMENTS |
|---|---|---|---|
| A. Identifies self & Department when answering the telephone. | | X | |
| B. Triages phone calls appropriately & contacts the provider(s) as necessary. | | X | |
| C. Takes & routes messages accurately | | X | |
| D. Answers phone within 3 rings during office hrs | | X | |
| E. Returns to all calls on hold every 90 seconds & gives caller an update or takes a message. | | X | |
| F. Actively listens to patients or other customers' needs & determine the best course of action. | | X | |
| G. Follows up w/ the patient or referring provider as applicable within 24 hours | | X | |
| H. Follows Department standard for emergent/routine of appointment & phone calls. | | X | |
| I. Documents any clinical issue (including prescription refill) in the form of a "written" message for the physician's approval & for documentation in the clinical chart according to UHMG Policies & Procedures | | X | |

UHPS000318

 **University Hospitals**

**UH Performance Evaluation**
ASSOCIATE & PROFESSIONAL

**5. Competency:** Follows up and reconciles clinical aspect of physician's practice

**Performance Expectations & Metrics**

| | MET | NOT MET | COMMENTS |
|---|---|---|---|
| A. Preps charts and collects all necessary information/documentation prior to patient's clinic or surgery visit | | X | |
| B. Calls in prescriptions and/or refills as directed by physician. | | X | |
| C. Receives & accurately reports lab, xray and/or consult information to nursing/medical staff within 24 hours | | X | |
| | | | |
| | | | |

Comment to 2013 Review:

I am sorry to say but I cannot agree with all your negative comments towards me;
I never call off;  am faithful and loyal to the department;  Have tried to be a team player
and yet you are making me look inefficient and undesirable to obtain employment here
or elsewhere.

I would think in view of all the difficulties and stress we have shared in this Department
including change of staff, and our having to undertake a very difficult deposition of late
concerning a former coworker, that you could have a little understanding and be a little
more greatful for something in my employment  as I am thinking I am doing my best,
which is not reflected in this review at all.  It is awful.

I have never said no to any requests, however last year my work was turned over to
Antoinette because they felt there was the need to make a change which shortly
afterwards put me in the hospital with severe anemia and a low hemoglobin which
required transfusions;  I could not understand why I was not functioning;  this has since
been solved and is okay.

I shall  continue to do my best and fulfill your expectations as requested;


Kathryn Fortunato
8·21·14

UHPS000320



| Performance Improvement Plan | | | | |
|---|---|---|---|---|
| Date: | December 3, 2013 | | To: | Kathryn Fortunato |
| From: | Deb Conti | | Cc: | |
| ☒ Initial PFP | ☐ 15 day follow-up | ☐ 30 day follow-up | ☐ 45 day follow-up | ☐ 60 day follow-up |

The following Performance Improvement Plan was prepared as a follow-up to recent discussions we had relating to your performance. The specific areas for improvement are listed below, along with my expectations for when I need to see improvement to occur. While I expect to see immediate improvement, I want you to know what I want to see is consistent improvement in the areas set forth below. Therefore, together we will review your performance against these areas formally on a regular basis over the next sixty days.

Issue #1          Effective Communication Skills

As a Doctor's Secretary at University Hospitals you are expected to have good communication skills and utilize those skills to support your physician and co-workers. Effective communication will aid you in building trust between you and the providers you support, as well as, your co-workers..  The following are some examples of problems in this area:

- *Emails without subject lines.*
- *Not using the proper greeting when answering the phone.*
- *Incomplete written communication.*
- *Using internal references like "bumped" or cancelled" when speaking with patients.*

Expectations going forward:

- All emails should contain a subject line which references the topic in the body of the email.
- The proper greeting should be used when answering the phone: "Division of Endocrinology, this is Kathryn, how may I help you?
- Any notes, messages or emails should contain information on to whom the message is addressed, the date the message was taken, proper spelling of the patient's name, the patient's date of birth, MRN, and phone numbers.  The message should include all pertinent details and be signed and dated by the doctor's secretary.
- When speaking with patients, your communication should be understanding, empathetic, and helpful.  For example, if a patient is on workflow dashboard to be rescheduled, your communication should be: "Hi, (patient name), this is Kathryn from (Dr. Name) office, I'm calling regarding your appointment on (date). Due to a scheduling conflict, we need to reschedule your appointment to a time when we can provide the best patient care" Then offer the patient available slots.

DEFENDANT'S
EXHIBIT
9
6·28·16
PENGAD 800-631-6989

UHPS000329

**Issue #2**          **Effective use of Athena**

As a doctor's secretary you are expected to use Athena according to your training,, as well as, schedule appointments within the provider's templates.    The following are some examples of problems in this area:

- *Creating a slot when scheduling patients.*
- *Not scheduling in the correct location for the provider.*
- *Scheduling appointment for less than the provider's required appointment time.*

*[handwritten] HAVE NoT CREATED ANY SLOTS while working on Reschedule*

**Expectations going forward:**

- Schedule patient appointments in the available slots only., without creating a slot.
- Verify that you are in the proper location in Athena before scheduling a patient.
- Schedule appointments according to the requirements of the provider.  For example, 20 minutes for follow ups and 40 minute new appointments for Dr. Sood.
- End the call with the patient by repeating the name of the provider and the date and location of the scheduled appointment.

**Issue #3**          **Effective use of UHCare Ambulatory**

As a doctor's secretary. you are expected to use UHCare Ambulatory according to your training, as well as, according to the requests of your providers.   The following are some examples of problems in this area:

- *Not entering messages into call processing.*
- *Not entering prescriptions into UHCare Ambulatory.*

**Expectations going forward:**

- All messages must be entered in to the call processing function of UHCare Ambulatory.
- All prescription requests must be entered into UHCare Ambulatory.
- Any information your provider requests to be scanned into UHCare Ambulatory, must be scanned.

**Issue #4**          **Acceptance of a diverse workforce**

As an employee of University Hospitals, you are expected to accept and respect the diverse cultures, races, ethnicities, etc of our workforce.    The following are some examples of problems in this area:

- *References to the work performance of your African American co-workers as "you know how they are"*
- *Referring to someone's race as the reason for poor work performance.*

**Expectations going forward:**

- All references to co-workers should be professional and focus on performance, not race, ethnicity, etc.

*[handwritten] I Do NoT Focus THis WAY TRY To Be ProFessional As PoSSible*

**Issue #5**          **Working according to manager's instructions**

As an employee of University Hospitals, you are expected to work according to your scheduled hours and effectively perform the duties assigned by your manager.    The following are some examples of problems in this area:

- *Not transferring phones to co-workers as instructed.*
- *Not pulling charts for co-workers.*

*[handwritten] I Do TRansfer Phone or Pull charts as Requested*

Page 2

UHPS000330

*Any Prior Dissatisfaction could have been Related to the Fact I had a Medical Issue not aware of until noted by Rep & Treated as inpatient.*

- *Not preparing charts as instructed.*

**Expectations going forward:**

- Work hours scheduled by manager.
- Perform duties as assigned..

Your future success resides in your ability to improve your performance in these key areas.  I am hopeful that you will take the necessary steps to improve your performance.  You will need to take the appropriate actions to work on the areas above and take advantage of the hospital resources.    I am also available to assist in your development.

Next Steps:
- First follow-up meeting (15 days from the date of the PIP)
- Second follow-up meeting (30 days from the date of the PIP)
- Third follow-up meeting (45 days from the date of the PIP)
- Fourth follow-up meeting (60 days from the date of the PIP)

This Performance Improvement Plan is intended to allow you a reasonable amount of time to correct the performance issues noted in this document.  Not meeting the expectation set forth in this Performance Improvement Plan can result in your immediate discharge.

Employee Acknowledgement and Receipt of this Document:

Kathryn Fortini
_____
Employee Signature

_____
Date

Deborah A Conti
_____
Manager Signature

12/5/13
_____
Date

UHPS000331



## University Hospitals

| Performance Improvement Plan | | | | | |
|---|---|---|---|---|---|
| Date: | August 19, 2014 | | To: | Kathryn Fortunato | |
| From: | Deb Conti | | Cc: | | |
| X☐ Initial PFP | ☐ 15 day follow-up | ☐ 30 day follow-up | ☐ 45 day follow-up | ☐ 60 day follow-up | |

The following Performance Improvement Plan was prepared as a follow-up to our recent discussions relating to your performance. The specific areas for improvement are listed below, along with my expectations and requirements going forward. In the areas set forth below, I expect to see immediate improvement, I expect to see consistent upward improvement, and I expect to see this improvement maintained, and not drop off. Therefore, together we will review your performance against these areas formally on a regular basis over the next sixty days.

Issue #1          Effective Communication Skills

As a Doctor's Secretary at University Hospitals you are expected to have good communication skills and utilize those skills to support your physicians and co-workers. Effective communication will aid you in building trust between you and the providers you support, as well as, your co-workers.  The following are examples of unacceptable performance on your part:

- *Emails without subject lines.*
- *Not using the proper greeting when answering the phone.*
- *Incomplete written communication.*
- *Using internal references like "bumped" or cancelled" when speaking with patients.*

Expectations going forward:

- All emails should contain a subject line which references the topic in the body of the email.
- The proper greeting should be used when answering the phone: "Division of Endocrinology, this is Kathryn, how may I help you?"
- Any notes, messages or emails should contain information on to whom the message is addressed, the date the message was taken, proper spelling of the patient's name, the patient's date of birth, MRN, and phone numbers.  The message should include all pertinent details and be signed and dated by the doctor's secretary.
- When rescheduling patients your communication should be: "Hi, (patient name), this is Kathryn from (Dr. Name) office, I'm calling regarding your appointment on (date).  Due to a scheduling conflict, we need to reschedule your appointment to a time when we can provide the best patient care," Then offer the patient available slots.

Issue #2          Effective use of Athena



DEFENDANT'S
EXHIBIT
10
6-28-16

Page 1

UHPS000334

As a Doctor's Secretary you are expected to use Athena according to your training, as well as, schedule appointments within the provider's templates.  The following are examples of unacceptable performance on your part:

- *Creating a new time slot when scheduling patients, instead of working with existing time slots*
- *Not scheduling in the correct location for the provider.*
- *Scheduling appointment for less than the provider's required appointment time.*

**Expectations going forward:**

- Schedule patient appointments in the available slots only; without creating a slot.
- Verify that you are in the proper location in Athena before scheduling a patient.
- Schedule appointments according to the requirements of the provider.  For example, 20 minutes for follow ups and 40 minute new appointments for Dr. Sood.
- End the call with the patient by repeating the name of the provider and the date and location of the scheduled appointment.

**Issue #3**        **Effective use of UHCare Ambulatory**

As a doctor's secretary, you are expected to use UHCare Ambulatory according to your training as well as according to the requests of your providers.  The following are examples of unacceptable performance on your part:

- *Not entering messages into call processing.*
- *Not entering prescriptions into UHCare Ambulatory.*
- *Selection of incorrect patients for follow-up*

**Expectations going forward:**

- All messages must be entered in to the call processing function of UHCare Ambulatory.
- All prescription requests must be entered into UHCare Ambulatory.
- Any information your provider requests to be scanned into UHCare Ambulatory, must be scanned.
- Before sending task or closing account, verify correct patient information

**Issue #5**        **Working collaboratively with the team**

As an employee of University Hospitals, you are expected to work according to your scheduled hours and effectively perform the duties assigned by your manager.  The following are examples of of unacceptable performance on your part:

- *Not transferring phones to co-workers as instructed.*
- *Not pulling charts for co-workers.*
- *Not preparing charts as instructed.*
- *Not following the PTO request procedure.*

**Expectations going forward:**

- Work hours scheduled by manager.
- Perform duties as assigned.
- Follow all documented departmental procedures

Page 2

Kathryn, your future success at UH depends on your ability to improve your performance in these key areas on a consistent and sustained basis.  I am hopeful that you will take the necessary steps to improve your performance. You will need to take the appropriate actions to work on the areas above and take advantage of the hospital resources.  I am also available to assist in your development.

Next Steps: (Will add dates after legal approval)
- First follow-up meeting (15 days from the date of the PIP)
- Second follow-up meeting (30 days from the date of the PIP)
- Third follow-up meeting (45 days from the date of the PIP)
- Fourth follow-up meeting (60 days from the date of the PIP)

This Performance Improvement Plan is intended to allow you a reasonable amount of time to correct the performance issues noted in this document.  Failure to meet the expectation set forth in this Performance Improvement Plan will result in further discipline up to and including the termination of your employment.

Employee Acknowledgement and Receipt of this Document:

_____
Employee Signature

_____
Manager Signature

9-3-14
Date

9/3/14
Date

Page 3

UHPS000336

 **University Hospitals**

Corrective Action

HRPerf001

| I. EMPLOYEE DATA | | | | |
|---|---|---|---|---|
| First Name | M.I | Last Name | | Employee Number (Enter exactly as in Oracle) |
| Kathryn | | Fortunato | | 1123131 |

| Position | Year |
|---|---|
| Doctors Secretary 1 | 2014 |

| Select Entity | Department |
|---|---|
| UH Management Svs Org | UHMSO Medicine - Endocrinology Admin-85016 |

| (Check one) | ☐ Confirmation of Counseling | ☐ Warning | ☐ Final Warning/Suspension | ☑ Discharge |
|---|---|---|---|---|

**II. CIRCUMSTANCES**

*Dates of attendance or tardiness occurrences:*

| | | | | |
|---|---|---|---|---|

*Describe the circumstances leading to the corrective action:*

See attached PIP for details

*Please note the policy and procedure violated:*

HR-72 Attachment A #4

**III. ACTION PLAN**

Since the initiation on the PIP on August 19, 2014, Kathryn has shown very minimal improvement and remained inconsistent in her performance. Kathryn is not meeting minimum standards and is ineffective in the role of a Doctor's Secretary in the Endocrinology division.

Kathryn received copies of the following policies
HR-72
HR-83

1

24-APR-2012

DEFENDANT'S EXHIBIT

11

6-28-16

PENGAD 800-631-6989

UHPS000321

 **University Hospitals**

Corrective Action

## IV. EMPLOYEE COMMENTS

The enclosed reasons For Termination
are NOT TRUE or realistic.

I BELIEVE I was Terminated due TO
1) A RECENT Deposition For a Co-Worker

2) My clinical Diagnosis of Depression
RECENTLY CONFIRMED By Dr. acheson

3 My age of 67 that should NOT
Be considered.

## V. SIGNATURE OF ACKNOWLEDGMENT

I understand that I may contact an HR representative to discuss questions or concerns related to this document including optional complaint resolution steps. Other than in cases of discharge, should the performance concerns outlined in this document continue, additional corrective action up to and including discharge may occur.

| Employee Signature | Date |
|---|---|
| Employee refused to Sign | 10/30/14 |
| Manager Signature | Date |
| Wendala Conti | 10/29/14 |

PLEASE RETURN THIS FORM TO YOUR LOCAL HUMAN RESOURCES DEPARTMENT

HRPerf001                                    2                              24-APR-2012

UHPS000322

Overall, Kathryn has shown minimal improvement on her performance improvement plan. There continues to be significant performance concerns resulting in patient scheduling errors, including incorrect patient/physician or location, and delay i responding to patients needs. In the role of a Doctor's Secretary, it is imperative to have strong communication and collaboration skills; Kathryn has continued to not meet expectations in these critical skills for the role. Throughout the PIP, she has not appropriately responded to meeting requests and patient messages continue to be unclear or incorrect.  Kathryn is not using a collaborative approach to build trust with physicians and co-workers. Last, she was assigned a medical records chart project by manager which after multiple requests is not completed.

Fortunato, Kathryn
12/19/13 meeting:

Gave Ahuja packet to Dr. Razvi without reviewing what needs to be completed.  Instructed her to complete what she can and mark for signature.
Emails are more professional.
Seems to be choosing provider unavailable consistently.
Still typing pt message in word & not using call processing.  Instructed her to stop typing in word, and enter directly into call processing.  Showed her where she can mark for tasking when completed.
She stated she is not scheduling or taking messages for other docs.  Instructed her to completely handle any call she receives and not transfer patient.
Still using Portal.  Instructed her to use EMR.
Rescheduling patient whether or not she got a hold of them and sending them letter with new appointment.  Instructed her to leave on workflow dashboard until she contacts the patient directly.
Brought up how Collinwood is going bad but church is still all white Italians.
She stated she cannot tell which fellow saw the patient.  I let her know she could find the information in EMR and asked her if she needed more training.  She said she just needs to use it more.


DEFENDANT'S
EXHIBIT
12
6-28-16

UHPS000332

Fortunato, Kathryn
12/31/13 meeting:

Kathryn did not pull charts for Dr. Razavi clinic on 1/2/14. Kept Bonnie Speed waiting 1 hour while pulling.

Still finding frozen appointments Dr. Sood 1/3/14.

Still not using proper greeting consistently.

Dr. Sood mentioned that lack of competent secretarial support was one of his reasons for leaving. He struggled with Kathryn's inaccuracies for 6 years.

Deb Conti observes employee staring at printed faxes or computer without placing faxes in appropriate boxes, nor processing patient calls in AEMR.