1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3               -------------------

4    KATHRYN FORTUNATO,

5

6               Plaintiff,

7

8        vs.              Case No. 1:15-CV-1940PAG

9

10   UNIVERSITY HOSPITALS PHYSICIAN

11   SERVICES, INC.,

12

13              Defendant.

14              -------------------

15              Deposition of

16           KATHRYN FORTUNATO

17           June 28, 2016
                 9:00 a.m.

18
                 Location:
19    Vorys, Sater, Seymour and Pease
       200 Public Square, Suite 1400
20            Cleveland, Ohio

21       Grace M. Hilpert-Roach, RPR

22

23

24

25

```
 1        Q.     How long do you think it would be; how

 2   many years, more than ten or what range would

 3   you put it in?

 4        A.     Five to ten.

 5        Q.     Let me ask you today, how is your

 6   health today; are you fine?

 7        A.     Yes.

 8        Q.     Are you working today?

 9        A.     No.

10        Q.     When's the last time you were working?

11        A.     When I left the hospital.

12        Q.     When you left University Hospitals; is

13   that right?

14        A.     Yes.

15        Q.     Are you, I guess, medically able to

16   work today?

17        A.     Yes.

18        Q.     Has that been the case since you left

19   University Hospitals?

20        A.     Yes.

21        Q.     Do you have any work restrictions

22   today, meaning if your doctor --

23             MR. PORTER:  Go ahead.

24             THE WITNESS:  Is that okay?

25             MR. PORTER:  Yes.
```

1      A.      No.

2      Q.      When was the last time that you had

3   work restrictions, that your doctor would have

4   said, "Ms. Fortunato, you have these

5   restrictions," if ever; do you recall ever?

6      A.      No.  I don't recall.

7      Q.      Let me ask you a little bit about --

8   go into a little bit of the background before

9   we go into University Hospitals.  You've

10  obviously filed a lawsuit in this case, and

11  we're in Federal Court now.  Have you ever

12  filed any other lawsuits?

13     A.      I don't recall.

14     Q.      Your complaint mentions that you filed

15  a charge of discrimination; do you know what

16  that is?

17     A.      Yes.

18     Q.      Have you ever filed a charge, other

19  than the ones at issue in this case?

20     A.      No.

21     Q.      Have you ever filed for Workers'

22  Compensation at any employer?

23     A.      No.

24     Q.      Do you know what that is?

25     A.      I don't recall.

1    studying them.

2        Q.    Like what?

3        A.    The Excel.  We bought the package.

4              MR. PORTER:  One at a time.  He talks,

5    you finish.  If you could say yes or no rather

6    than "uh-huh," the court reporter would

7    appreciate it.

8              THE WITNESS:  Okay.

9        Q.    So you were telling me what computer

10   programs you're proficient in now.  Which ones,

11   if we were at a job interview, would you tell

12   me?

13       A.    Excel.

14       Q.    Any others?

15       A.    No.

16       Q.    Are you proficient today on Excel?

17       A.    Somewhat.

18       Q.    Somewhat.  Okay.

19             If I were to say I need a chart with

20   six categories in the chart and it's going to

21   be 100 different items in those six categories,

22   could you do that?

23       A.    I don't know.

24       Q.    You don't know?

25       A.    No.

1    Q.    When you say "somewhat," I guess, what
2    would you tell me you could do on Excel?
3    A.    I -- I don't recall.  It was all on
4    paper.
5    Q.    On paper?
6    A.    Yeah.
7    Q.    So you haven't actually used Excel?
8    A.    No.  Not in that degree.
9    Q.    Do you have it on your home computer?
10    A.    Uh-huh.
11        MR. PORTER:  Yes, no?
12    A.    Yes.
13    Q.    Have you used it at home?
14    A.    No.  Just -- no.
15    Q.    What kind of tool did you purchase or
16    get to become proficient?
17    A.    I don't recall.
18    Q.    It's like, what, a written book or
19    what is it?
20    A.    No.  It's a CD.
21    Q.    You put it in your computer and --
22    A.    Uh-huh.
23    Q.    -- and watch?
24    A.    Right.
25    Q.    Did it take you through Excel?

```
 1       A.      Uh-huh.

 2       Q.      We'll look at your medical records,

 3   but how long did you have depression?  When do

 4   you believe you were first diagnosed with it?

 5       A.      That would be when I gave Dr. Arafah

 6   that letter.

 7       Q.      Excuse me?

 8       A.      I gave Dr. Arafah a letter, and I

 9   don't remember what the date was on there.

10       Q.      Was it with the documents that you

11   produced to us today; is that what you're

12   saying?

13       A.      Uh-huh.

14       Q.      Okay.  I'll put them in so that you

15   can refer to them.

16       A.      I don't know what the date was.

17            MR. PORTER:  Since you made copies,

18   could we have the originals back?

19            MS. HOLLINGSWORTH:  Sure.

20                   -  -  -  -  -

21       (Thereupon, Defendant's Exhibit 3,

22       Miscellaneous Documents, was marked for

23       purposes of identification.)

24                   -  -  -  -  -

25       Q.      I've handed you what's been marked as
```

```
1    Exhibit 3.  These are the documents -- I'm

2    going to represent to you -- if you look at 3

3    first, those are the documents that your

4    counsel provided to us this morning.

5        A.    Uh-huh.

6        Q.    I take it these are some additional

7    documents that you believe are relevant to the

8    case?

9        A.    Uh-huh.  2008.

10       Q.    Is there a letter in here that --

11       A.    Uh-huh.

12       Q.    It's the last page?

13       A.    Right.

14       Q.    You say September 9, 2008 is when you

15   were first diagnosed with it?

16       A.    Right.

17       Q.    Let me ask you this:  When I looked

18   through the medical records -- you understand

19   that we got your relevant medical records in

20   this case?

21       A.    Uh-huh.

22       Q.    You have to answer yes.  I'm sorry.

23       A.    Yes.

24       Q.    When I looked through those, this

25   letter -- "this" being the one at the back of
```

```
1     Exhibit 3 -- is the only letter that I saw that
2     was sent to or given to UH; is that a fair
3     statement?
4          A.    Yes.
5          Q.    So there's no other time, either prior
6     to or after, where you said, hey, here's a
7     letter from my doctor?
8          A.    No.
9          Q.    Okay.  That's what I --
10         A.    I don't recall, but --
11         Q.    Okay.  Because I had looked through
12    it, and I didn't see anything in the records.
13    But today you don't recall any others?
14         A.    No.
15         Q.    That document doesn't say that you had
16    any work restrictions.  And when I say "that
17    document," the letter from your doctor; it just
18    says you're going to be going in for therapy
19    twice monthly?
20         A.    Uh-huh.
21         Q.    You just have to answer yes.  I'm
22    sorry.
23         A.    Yes.
24         Q.    Did the doctor ever give you anything
25    in writing to say, "Ms. Fortunato, you have
```

1    restrictions beyond these two treatments"?

2        A.    I don't recall.

3        Q.    Okay.  Did you have ever any

4    restrictions?  Today you don't.  Did you ever

5    have any restrictions?

6        A.    Today?

7        Q.    Today I already asked you; you said

8    no.  Did you ever, since that 2008 forward,

9    have any restrictions that you're aware of?

10       A.    No.

11       Q.    So let's go through then this charge.

12   Let's go back to Exhibit 2.  And I just want to

13   ask you about that second paragraph in the

14   particulars.  If you could go to page 2, and it

15   says, "I believe that Deb Conti" -- do you see

16   that?

17       A.    Yes.

18       Q.    And when I read through it, it says --

19   the second sentence says, "Due to my

20   disability, I was not performing at an

21   acceptable level."  Let me ask you:  Did you

22   agree with Ms. Conti that your work performance

23   was not up to UH's standards?

24       A.    No.

25       Q.    What did you mean by that sentence?  I

1    "Defendant hired a person under the age of 40

2    to replace Plaintiff as doctor's secretary."

3    Who was that; do you know?

4         A.    No.

5         Q.    Do you know who they hired, if

6    anybody?

7         A.    Unh-unh.  No.  I don't recall.

8    Unh-unh.

9         Q.    Do you know if anybody was hired to

10   replace you or the position was just absorbed

11   or anything like that?

12        A.    I don't recall.  I don't know a thing.

13        Q.    Okay.  And then if we look at

14   paragraph 16, do you see that one where it's

15   numbered 16?

16        A.    Uh-huh.

17        Q.    It says that you were required to

18   learn a new computer program, Excel; do you see

19   that?

20        A.    Uh-huh.

21        Q.    Okay.  There were other programs that

22   you were asked to learn and other issues as

23   well at that time, right?

24        A.    I don't recall.  Just the one.

25        Q.    So we'll get into your documents, but

1  you recall that Excel or your inability to use

2  Excel was one of the issues?

3      A.   That's right.

4      Q.   Let me just ask you, if today you're

5  only somewhat proficient, I assume that you

6  agree, as of the date of your discharge, that

7  you weren't proficient; is that a fair

8  statement, in Excel?

9           THE WITNESS:  Am I allowed to speak

10 out?

11          MR. PORTER:  Sure.  Answer his

12 question.

13     A.   The question is -- none of us had any

14 teaching, none of us had any background or

15 given an opportunity to learn it.  We were just

16 told you had to learn it.  And we should have

17 been sent to a training school, of which we

18 were not sent.

19     Q.   Okay.

20     A.   And it was all hit and miss, and we

21 were on the computer trying to learn it with

22 phones ringing and people concerned to get the

23 work done and there was no direct classmate --

24 class, you know, organized for us or sending us

25 to schooling the way they should have.

1    situation with Excel, but they hadn't taught

2    you how to do it.

3         Q.    Okay.

4         A.    So I did the old-fashioned typing

5    type, and they didn't like it.

6         Q.    They wanted it in the computer system;

7    is that a fair statement?

8         A.    Uh-huh.

9         Q.    I assume you agree that at University

10   Hospitals or any hospital one of the most

11   important things is proper maintenance of the

12   medical records?

13        A.    Oh --

14        Q.    Is that important?

15        A.    Oh, yes.

16        Q.    You don't disagree that they would

17   want to know where they're at, right?

18        A.    Every minute.

19        Q.    If a patient or a former patient said,

20   "I want my record," UH wanted to be able to

21   find it?

22        A.    That's right.

23        Q.    And did it come up that they said that

24   you can't just type it in, you have to use

25   Excel?

38

```
 1    actually try it or did you always just say no?

 2        A.    I didn't work with it until I finally

 3    was able to do a little bit at home.  Unh-unh.

 4        Q.    While at UH, did you ever actually try

 5    Excel; did you ever actually get on and try?

 6        A.    Yes, I did.  They had temporary ones

 7    over there, temporary old-fashioned trainings

 8    on there, but they didn't have anything that

 9    would apply to me.

10        Q.    There were some trainings at UH?

11        A.    Uh-huh.

12        Q.    And you did those?

13        A.    They were -- they weren't the kind

14    that we needed.  It was just telling you how

15    Excel is built, but nothing that you needed for

16    yourself for what job you were doing.

17        Q.    Okay.  And my question now is, when

18    you were given the medical records and they

19    said catalog these before sending them out, did

20    you ever try to put them into Excel?

21        A.    No.

22        Q.    So you always just typed it in?

23        A.    Uh-huh.

24        Q.    Even though Deb Conti had written you

25    up?
```

```
1      A.    Uh-huh.

2      Q.    Is that right?

3      A.    Uh-huh.

4      Q.    You have to answer yes.

5            MR. PORTER:  You have to say yes.

6      A.    Yes.

7      Q.    Now, just so I understand how many

8  categories, was this like you would put the

9  patient name?

10     A.    Yes, sir.

11     Q.    What other information would you put

12 on --

13     A.    Record number, date of birth.

14     Q.    Anything else?

15     A.    Oh, boy.  We're going back a long way

16 on that one.  Let's see.  The name, record

17 number, date of birth, and -- oh, the number on

18 the box.  So we knew where it find it, the

19 number on the box.

20     Q.    You would have like a four-column

21 lengthy list?

22     A.    Uh-huh.

23     Q.    Is that fair?

24     A.    That's right.

25     Q.    And did you ever go to one of the
```

1    Q.    You were on a computer?

2    A.    Word.

3    Q.    You went on to Word?

4    A.    You labeled everything and then you

5    saved it and then got it up the next day and --

6    Q.    You put it on Word, but you didn't put

7    it into Excel?

8    A.    No.

9    Q.    Okay.  Was there anything else that

10   you were asked to do at UH that you couldn't

11   do?  This one talks about you needed adequate

12   training.  We're back to paragraph 16.  I just

13   want to know at this point if you can recall

14   anything else that UH said to you, "Ms.

15   Fortunato, we need you to do X," and you

16   couldn't do it because you didn't have enough

17   training; was it just Excel or was there

18   anything else?

19   A.    Telephone.

20   Q.    Telephone?  Okay.

21         Anything else before I ask you about

22   telephone?

23   A.    Well, we were doing prescriptions, and

24   I learned that from the nurse in one hour.

25   Q.    I'm just asking you -- right now I'm

44

```
1    again and again.  They got mad, because they

2    said, "This is supposed to be confidential."

3    She was running her own set plus the office

4    set.  In the meantime, messages are building

5    up, and Dr. Arafah is catching the devil

6    because he's not returning his phone calls.

7    Why?  Because she had done this. And I thought

8    to myself -- I never complained; I never said a

9    word.  That was -- that's not the way you're

10   supposed to run things.

11       Q.    But my question was, was there

12   anything on the phone that you couldn't do?

13   This one sounds like Carol just kind of made it

14   difficult. Was there anything that you didn't

15   know how to do?

16       A.    No.  We knew how to run the phones.

17       Q.    You knew how to use --

18       A.    Yeah.  It was just neglect going on.

19       Q.    As we sit here today, the only thing

20   that you were asked to do as a medical

21   secretary that you couldn't do was Excel?

22       A.    Excel, yes.

23       Q.    Everything else you were able to learn

24   one way or the other?

25       A.    Uh-huh.
```

1    Q.    As to the phone, I take it that even

2    though Carol wasn't giving you the password,

3    you didn't tell your supervisors that, "Hey,

4    Carol is making my life difficult"?

5    A.    You had to be careful what you were

6    saying; you got yelled at for it.

7    Q.    Carol would get mad at you?

8    A.    So would Deb Conti.

9    Q.    Deb would get mad if you said that

10   "Carol is not letting me get messages"?  You

11   think she would be okay with you not being able

12   to get messages and leaving customers at risk?

13   A.    She would just make smart -- difficult

14   comments.

15   Q.    So there were customers who were

16   calling in, patients calling in, and they might

17   not have gotten a follow up because you

18   couldn't get the messages?

19   A.    Uh-huh.

20   Q.    Is that right?

21   A.    That's right.

22   Q.    I assume that when you said the doctor

23   was taking heat, the whole department was

24   probably like, what's going on?

25   A.    They were getting a little mad because

1    they weren't getting returned calls.  "Why

2    didn't you take care of this?"  Why didn't you

3    do this, that, and other?

4         Q.    Did you think to raise your hand and

5    say Carol was doing it?

6         A.    No.

7         Q.    No?

8         A.    No.

9         Q.    Okay.

10        A.    She's a bully.

11        Q.    She's a bully.  Okay.

12              Let's look at the next page of the

13   complaint, page 4.  If you would turn the page

14   to page 4, I just want to ask you, if we look

15   at paragraph 25, it says, "Plaintiff requested

16   Defendant make reasonable accommodations."  I'm

17   going to represent to you Plaintiff is you and

18   Defendant is University Hospitals Health

19   Systems, Inc.  I think it's changed around

20   today, but it's UH, your former employer.  What

21   accommodations do you recall asking for?

22        A.    I have to think what they're talking

23   about.  Probably throwing a great deal of work

24   on me.  I wound up doing half of her work all

25   the time.

```
 1        Q.    Carol's work?

 2        A.    Yes.

 3        Q.    Is there anything else that you can

 4   recall?  Is there anything that you went to Deb

 5   Conti about and said -- I take it you went to

 6   Deb and said you needed training in Excel,

 7   right?

 8        A.    It didn't work.  She was rude.  It was

 9   a waste of time.

10        Q.    My question is, did you ever go to any

11   supervisor and say, hey, I need certain things

12   for my job or did you just try to do it the

13   best you could?

14        A.    Uh-huh.

15        Q.    Just did the best you could?

16        A.    Yeah.

17        Q.    You didn't go and ask for them to give

18   you help or anything like that?

19        A.    Unh-unh.  Never.  I would go to

20   Dr. Arafah.

21        Q.    What did you talk to Dr. Arafah about?

22        A.    Tell him what's going on.  He would

23   say, "Okay.  I'll check into it."

24        Q.    Did you ever ask Dr. Arafah for any

25   specific changes to your job or anything like
```

1   that?

2       A.    No.

3       Q.    When did Dr. Arafah leave; was he

4   there when you were let go?

5       A.    As far as I know.  I don't know.

6       Q.    You don't know?

7       A.    No.  I don't know.

8       Q.    Let's just go through some of the

9   basic documents from your employment.

10                    -  -  -  -  -

11          (Thereupon, Defendant's Exhibit 4,

12          Application for Employment, was marked

13          for purposes of identification.)

14                    -  -  -  -  -

15      Q.    Do you recognize Exhibit 4 as your

16   employment application?

17          MR. PORTER:  Take your time,

18   Ms. Fortunato.

19      A.    This is something about radiology.

20   Oh, these are old.

21      Q.    If you look at the last page, is that

22   your signature on that last page?

23      A.    Uh-huh.

24      Q.    You have to answer yes.  I'm sorry.

25      A.    Yes.

```
 1        Q.    And when you were hired, you were 55
 2   years old?
 3        A.    Okay.
 4        Q.    Okay.  They hire you; you're over 40,
 5   right?
 6        A.    Uh-huh.
 7        Q.    And did anybody ever -- let me ask you
 8   just in general, did anybody ever make any
 9   age-based comments to you, anything negative
10   about your age?
11        A.    I don't recall.
12        Q.    Obviously, if somebody would have
13   said, "Hey, we don't like old people here," you
14   would recall that --
15        A.    No.
16        Q.    -- right?
17              So let me show you some of the
18   policies from your employment.
19                    -   -   -   -   -
20        (Thereupon, Defendant's Exhibit 5,
21        Corporate Code of Conduct, was marked for
22        purposes of identification.)
23                    -   -   -   -   -
24        Q.    These are just some of the
25   acknowledgements that you signed off on during
```

1    lacking far beyond Excel?

2        A.    She did in the beginning, and in the

3    end she told me how fabulous I was doing and

4    then fired me.

5        Q.    If you look at the last page of that

6    Exhibit 11, it says, "Kathryn has shown minimal

7    improvement on her performance improvement

8    plan." Do you see that?

9        A.    No.  Which one is that?

10       Q.    The last page of Exhibit 11.  If you

11   turn to the last page.

12       A.    Okay.  Thank you.

13       Q.    Do you see that first sentence,

14   "minimal improvement"?

15       A.    Uh-huh.

16       Q.    You have to answer yes.

17       A.    Yes.

18       Q.    And then it says, "There continues to

19   be significant performance concerns," and it

20   goes through patient scheduling errors; did you

21   ever have those?

22       A.    Very few.

23       Q.    "Including incorrect patient/physician

24   or location," did you ever have those?

25       A.    Very few.

1       Q.    You had them, but it's just not that
2   many?
3       A.    Not that many.  Unh-unh.
4       Q.    "Delay in responding to patient
5   needs," did that ever happen?
6       A.    No.
7       Q.    And then it says, "In the role of a
8   doctor's secretary, it's imperative to have
9   strong communication and collaboration skills."
10  Did you agree with that?
11      A.    I don't know what that meant.
12      Q.    You don't know that you would have to
13  communicate well with your patients?
14      A.    Oh, sure.  Yeah.  Yeah.
15      Q.    You would have to work with Carol and
16  others to be able to service them, right?
17      A.    Yes.
18      Q.    And it says, "Kathryn has continued to
19  not meet expectations in these critical skills
20  for the role."  Do you see that?
21      A.    Yes.
22      Q.    And then it says, "Throughout the PIP,
23  she has not appropriately responded to meeting
24  requests and patient messages continue to be
25  unclear or incorrect."  Did you have issues

1    with attending the meetings that were scheduled

2    with Deb and HR about your PIP?

3         A.    There were no meetings.

4         Q.    Did they send you calendar invites and

5    you failed to attend?

6         A.    Nope.  There was one I didn't -- I

7    didn't know anything about.

8         Q.    One that you didn't know anything

9    about?

10        A.    I didn't answer to one, yes.

11        Q.    Did you go to the meeting?

12        A.    I went to everything that I was asked

13   to go to, yes.

14        Q.    So there were meetings with HR and

15   with Deb?

16        A.    No.  Just her.  And she brought down

17   the other girl, that Williams girl.

18        Q.    She's in human resources?

19        A.    Yeah.  Uh-huh.

20        Q.    They would meet with you and review

21   your performance before your discharge?

22        A.    They would meet with me, but nothing

23   was ever -- nothing was ever worked out.

24        Q.    Nothing was ever --

25        A.    It was all negativity, and you're a

1   bad girl and this, that, and the other.  And

2   that's when I tried to tell them that I was on

3   a medication and to please be patient with me.

4   And that's when they sent me to Springer, and

5   she said the same thing and then Conti went

6   ahead and did what she chose to do.

7        Q.    Who's Springer?

8        A.    She's a counselor --

9        Q.    Okay.

10       A.    -- for UH.  And if you're having any

11  kind of problems, you're supposed to go to this

12  lady.  And I did.  And I walked in there, and I

13  told her that I had just gotten reamed.  I

14  don't even know what it was for.  It had me a

15  little bit on the nervous jittery side, and she

16  said she's known for being that way.

17       Q.    Okay.  So let's look at the second

18  page of that document.  I just want to ask you

19  about a couple things.  You did write, "The

20  enclosed reasons for termination are not true

21  or realistic."

22       A.    They weren't.

23       Q.    Did you write that; is this your

24  handwriting?

25       A.    Yes.

```
 1        Q.    And you gave three reasons why you

 2   think you were terminated, right?

 3        A.    Yes.

 4        Q.    So let's just go through.  "A recent

 5   deposition for a co-worker," what's that all

 6   about?

 7        A.    That was Marcia's.  She really -- she

 8   really gave it to her.  She had a horrible time

 9   there.

10        Q.    What did your deposition -- what came

11   out of it?

12        A.    Hers or mine?

13        Q.    Yours.  You say "a recent deposition."

14   What do you mean by it?  You say, "A recent

15   deposition for a co-worker," what do you mean

16   by that?

17        A.    I had to go to Marcia's deposition.

18        Q.    You went to Marcia's?

19        A.    Uh-huh.

20        Q.    What was said that you thought

21   impacted your employment?

22        A.    It was threatened.

23        Q.    You were threatened?

24        A.    Very much so.

25        Q.    At the deposition?
```

```
 1        A.    I wouldn't even know how to answer
 2   that.
 3        Q.    Okay.  And then --
 4        A.    Yeah.
 5        Q.    The final thing it says, "My age of 67
 6   that should not be considered."  Do you see
 7   that number 3?
 8        A.    Yeah.
 9        Q.    Why do you think your age was
10   considered?
11        A.    Because they can get a younger girl in
12   there and do twice the work.
13        Q.    But you don't know if anybody was
14   brought in?
15        A.    No.  I know they had a couple girls
16   coming through the door, and they looked like
17   they were prospects to be interviewed, but I
18   never questioned it.  You don't question
19   everybody that comes in the door.
20        Q.    Aside from seeing some younger women
21   coming through the door, you don't know if they
22   were there for job interviews or what, right?
23        A.    Never asked.
24        Q.    And when did they come through the
25   door?
```

1       A.      Shortly before I got fired.

2       Q.      Shortly before?

3       A.      Yes.  Like a week or two.  And you

4  come in with a suit and you're all dressed up,

5  and you know you're not there to sell drugs,

6  you know what I mean, drug reps, so --

7       Q.      So you didn't -- you assumed they

8  weren't there to sell pharmaceuticals to the

9  doctors, but they might have been there to

10  interview for some job?

11      A.      I think so, yeah.

12      Q.      You think so?

13      A.      Uh-huh.

14      Q.      Did you ask anybody?

15      A.      Nope.

16      Q.      Is there anything else that made you

17  think that your age was considered?

18      A.      Yeah.  I heard people talking, and

19  they were saying that when you got to a certain

20  age, they were going to let them go.  It was in

21  the hallway; one of the supervisors were

22  talking.  And it was kind of chaos in the

23  hospital that if you were a certain age, you

24  were on your way out.

25      Q.      When and who said this?  Did you even

1      A.    Uh-huh.  Yes, sir.

2      Q.    Is she still there?

3      A.    Well, I saw her about a month ago

4  getting on an elevator, and I think she still

5  is there, but I don't speak to her.

6      Q.    You think she's probably close to 60

7  now?

8      A.    She's a year younger than me.

9      Q.    How old would she be today?

10      MR. PORTER:  Objection.  Go ahead.

11      A.    67, I guess.  66, 67, something like

12  that.

13      Q.    I thought when we went through

14  initially you said she was in her 50s.

15      A.    No, no, no.  She's older than that.

16      Q.    So they didn't discharge her?

17      A.    Not that I know of.  I'm not allowed

18  to talk to those people, so I never -- I'm

19  supposed to keep to myself.

20      Q.    When you left, Ms. Campbell was still

21  there?

22      A.    As far as I know.  Uh-huh.

23      Q.    Toni was in the department, and Toni

24  was, you thought, what age?

25      A.    Toni was in her 40s.

97

1    Q.    Okay.

2    A.    Somebody just has strange ideas in

3    their mind, I guess.

4    Q.    Let me just ask you, we went through

5    -- obviously, there was lots of things that

6    happened in your employment, and I've tried to

7    focus us on the documents that the hospital

8    believes led to your ultimate discharge.

9    A.    Uh-huh.

10    Q.    Just so I understand, as to the

11    performance issue, I think you said at one

12    point that -- you have said that you couldn't

13    do Excel. I'm not saying that you believe you

14    should have gotten training, but you admit that

15    you couldn't do that?

16    A.    No.  Not well enough.

17    Q.    You believe that you could do

18    everything else that was asked, right?

19    A.    Yes.

20    Q.    You said at one point that it may have

21    appeared that you had made mistakes because of

22    Carol Campbell; is that an accurate statement?

23    A.    Yes.

24    Q.    And I think you said that if somebody

25    came to you and said, hey, this mistake was

1    made, that you wouldn't speak up and say Carol

2    Campbell caused it; is that fair?

3         A.    Uh-huh.

4         Q.    So I guess with that, let me just ask

5    you, I know that you disagree -- you don't

6    agree with all of the performance issues Ms.

7    Conti laid out, right?

8         A.    No.

9         Q.    Are some of them accurate based on

10   what Carol Campbell was doing?

11              MR. PORTER:  Objection.  Go ahead.

12        A.    I don't recall, really.

13        Q.    Were there some patient issues?

14        A.    There were some patient issues I went

15   ahead and straightened out for her.

16        Q.    Did the doctors or Ms. Conti believe

17   that some patient issues were caused by you?

18              MR. PORTER:  Objection.  That's a

19   question for them.  Go ahead.

20        A.    No.

21        Q.    No?

22        A.    No.

23        Q.    Did they believe that some of your

24   communications might not have been up to par?

25              MR. PORTER:  Same objection.

1       A.      No.

2       Q.      You do agree that, I guess at least

3   over the last year of your employment, Ms.

4   Conti was giving you some specific performance

5   issues that she believed you needed to improve

6   upon, right?

7       A.      Just that one.

8       Q.      I think we went through --

9       A.      That was it.

10      Q.      I'm happy to go back through them, but

11  you got two performance improvement plans,

12  right?

13      A.      Right.

14      Q.      And then you guys met a number of

15  times, right?

16      A.      Right.

17      Q.      And HR came down, right?

18      A.      Yeah.  But during those times, I tried

19  to tell them that I was on medication for

20  depression, please stop screaming and yelling

21  at me, please stop throwing things at the

22  table.  They just kept right on going, and he

23  said, "That's your problem, not mine."

24      Q.      I guess you're saying that they were

25  really upset because they believed your

```
1    performance was really bad?

2         A.    No.

3         Q.    What would cause the arguments?

4         A.    They were trying to get rid of me.

5    It's that simple.  They were trying to dump me.

6    They were -- what's the word for it? --

7    indifferent, difficult.

8         Q.    What was the yelling about in the

9    meetings; what do you recall?

10        A.    Well, you should have known better and

11   this, that, and the other.  I tried to tell

12   them I hadn't even done anything wrong, and

13   they just continued to --

14        Q.    I think you said they were negative.

15   Obviously, I mean, you do agree that there are

16   times when if an employee --

17        A.    Sometimes everybody makes a mistake.

18        Q.    And, obviously, those times may have

19   to be negative, right?

20        A.    Right.

21        Q.    If I missed an appointment, if I'm

22   late somewhere, my client might say, "Dave, you

23   should have been on time," and that might be

24   negative --

25        A.    Uh-huh.
```

1    at you two and you two are getting disciplined?

2         A.    Disciplined, right.

3         Q.    I think your documents say that you

4    didn't keep any notes during your employment,

5    like a journal or anything like that?

6         A.    I probably did here and there, but I

7    was afraid to have them out because I didn't

8    know -- she would go through all our paperwork

9    and snoop around at everything we had.

10        Q.    Who, Carol?

11        A.    Yeah.  Carol did it.  Uh-huh.  We were

12   afraid to take a day off because she would go

13   through all the stacks of paperwork, and she

14   would keep them.  So with that, we had to be

15   very cautious.  I never left her any messages.

16        Q.    Today do you have any notes from your

17   employment, a journal or anything like that?

18        A.    I don't think so.

19        Q.    Okay.  You said that there was that

20   conversation in the hallway that you overheard

21   somebody --

22        A.    I did.

23        Q.    You never heard any other age comments

24   during your employment?

25        A.    No.  Just that one.  Yeah.

```
 1              MR. CAMPBELL:  Okay.  Let's take a
 2    short break.  I'm going to confer with my
 3    colleagues.  I think we're almost done.
 4              THE WITNESS:  Okay.
 5              MR. CAMPBELL:  We'll be back here
 6    momentarily.
 7                    (Recess had.)
 8              MR. CAMPBELL:  At this time I don't
 9    have any further questions for you, unless your
10    counsel has any questions for you.
11              MR. PORTER:  I do have a few follow up
12    for redirect.
13              EXAMINATION OF KATHRYN FORTUNATO
14    BY MR. PORTER:
15       Q.    You mentioned a person by the name of
16    Bixenstine; do you recall that?
17       A.    Yes.
18       Q.    Who is this Bixenstine person?
19       A.    He's an attorney, and he was on
20    Marcia's case, the African American girl that
21    was terminated.
22       Q.    And how did you know him?
23       A.    Because he called us all in and talked
24    with us and asked us to explain some of the
25    things that they were giving Marcia a hard time
```

```
 1    about, to verify things, et cetera and et

 2    cetera.  And when she was terminated, he had --

 3    he came to each one of us and we talked to him

 4    and he explained the things that were happening

 5    in the department.  And when they started on

 6    me, I called him, I called him at home because

 7    I was so desperate to get help.  And he said,

 8    "That doesn't surprise me because I knew you

 9    would be next."

10        Q.    When did this conversation take place?

11        A.    Right after Marcia got -- she got

12    fired.

13        Q.    What year was that?

14        A.    A couple years ago.

15        Q.    That would have been shortly before

16    you were fired?

17        A.    Right.  Uh-huh.

18        Q.    He said that specifically you were

19    next?

20        A.    Yeah.  He said, that doesn't surprise

21    me at all, you're next, but I can't help you

22    for whatever reasons.  And you need to call

23    Marcie Munson or Manson, Marcie over at the

24    hospital and let her know that you're being

25    harassed beyond words.  Well, I did, but
```

```
1    nothing ever came out of it.
2         Q.    What was Marcie Munson's role at UH?
3         A.    She was an attorney.
4         Q.    Did you hear back from her?
5         A.    Never.  Unh-unh.
6         Q.    And with regard to Plaintiff's Exhibit
7    9, if you could bring that in front of you.
8    I'm not sure where it is in the pile.  There it
9    is.
10        A.    Okay.
11        Q.    If you go to page 3, do you recognize
12   -- next page, ma'am.  Do you recognize the
13   handwriting at the top?
14        A.    Yes.
15        Q.    Whose is it?
16        A.    Mine.
17        Q.    And did you write this on or about
18   December 5th, 2013?
19        A.    Yes.
20        Q.    And you made a reference there about a
21   medical issue; do you see that, ma'am?
22        A.    "Any prior dissatisfaction could have
23   been related to the fact that I had a medical
24   issue, not aware of until noted by" -- that's
25   right.  They wouldn't honor it until I went to
```

1    PIP -- I mean, until I went to Springer, that

2    lady, Springer, and she told me that I should

3    take time off until the Lithium started to work

4    in my system.  I said that I'm afraid I would

5    get fired if I left, and she said, no, they

6    wouldn't, and I got fired anyway.

7        Q.    And so when you were asked whether you

8    had informed UH about your medical issue, you

9    had mentioned 2008 and shortly before you were

10   fired?

11       A.    Right.

12       Q.    And does this refresh your

13   recollection as to when you told UH about your

14   medical issue?

15       A.    I told them every time she called me

16   in the room, every single time she called me in

17   there I told her the doctor's name and what was

18   being done for me, and she said, "That's your

19   problem, not mine."

20       Q.    You were asked to testify about the

21   PIP that you were placed on.  That's

22   Plaintiff's Exhibit 10.  Would you locate that,

23   ma'am?

24       A.    It's not that one.

25       Q.    This is it, ma'am, Plaintiff's Exhibit

1      A.    A little bit here and there, but I

2  don't do it as often being at home.

3      Q.    Have you found, during your job

4  search, whether or not employers want you to

5  know Excel?

6      A.    They like you to know it.  Uh-huh.  My

7  sister-in-law gave me one, too.  She worked for

8  Jones Day for years, and she had one.

9      Q.    Do you think you could master Excel

10  with the proper training?

11      A.    Yeah, I would.

12          MR. PORTER:  I have nothing further.

13  Thank you.

14      FURTHER EXAMINATION OF KATHRYN FORTUNATO

15  BY MR. CAMPBELL:

16      Q.    I just want to follow up on one thing.

17  You say that you called at some point, I guess,

18  after the deposition, you say you called

19  Mr. Bixenstine?

20          MR. PORTER:  Yes or no, ma'am?

21      A.    No.

22      Q.    You did not?

23      A.    I did contact him, uh-huh.  Before I

24  got fired, yeah.

25      Q.    You said you called him at home?

116

```
 1        A.    I got ahold of him at home, yeah.
 2        Q.    You had his home number; how did you
 3   call him?
 4        A.    I think I looked and I found a number
 5   and I called it.  And they told me, here's the
 6   number you call during the day, and I said I
 7   didn't know how to get ahold of him.  He said,
 8   "You're really worried, aren't you?"  "Yeah."
 9        Q.    Why don't you tell me everything that
10   you recall from the conversation when you
11   phoned him. First of all, how long was the
12   conversation?
13        A.    Five, ten minutes.  It was quick.
14   Told me what to do, how to try and --
15        Q.    I want to know everything that you can
16   recall, like when you called, go through and
17   tell me each of the topics that you guys
18   addressed and everything that you can recall.
19        A.    Told him what was going on.  I'm being
20   harassed, I was worried, what to do, what not
21   to do.  And he told me that I needed to go see
22   human resources, which was the first mistake.
23        Q.    Okay.
24        A.    And what else did he tell me to do?
25   He said it didn't surprise him that I was being
```

1    -- I was the next one on the list.  Go to human

2    -- oh, and then to call Marcie Manson and talk

3    to her and let her know where you're coming

4    from, this, that, and the other.  And I did.  I

5    got ahold of her.  And that's what Carol got --

6    she was starting to watch what I was doing, and

7    she knew that I had called human resources,

8    because they may have called back and she

9    picked up the line.  And that's when it really

10   started.

11       Q.    Okay.  So we had already talked about

12   this conversation; it was after the deposition

13   when Bart told you to go to HR?

14       A.    Yes.

15       Q.    You said that Carol found out?

16       A.    Uh-huh.

17       Q.    And she tried to set you up to look

18   like you failed to meet expectations?

19       A.    Uh-huh.

20       Q.    Is that right?

21       A.    Yes.

22       Q.    This was, I take it, what, a couple

23   months or six months before your discharge or

24   how long?

25       A.    Yeah.

EEOC FORM 131 (11/09)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Ms.  Heather Harmon<br>Human Resources Manager<br>3605 WARRENSVILLE CENTER ROAD<br>Shaker Heights, OH 44122<br><br>RECEIVED 3-13-15 | **Kathryn Fortunate** |
| | THIS PERSON (check one or both)<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**532-2015-00360** |

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[ ] Title VII of the Civil Rights Act (Title VII)  [ ] The Equal Pay Act (EPA)  [X] The Americans with Disabilities Act (ADA)

[X] The Age Discrimination in Employment Act (ADEA)  [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **13-APR-15** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by  to the enclosed request for information and send your response to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources.  If you would like to participate, please say so on the enclosed form and respond by        **25-MAR-15**
   to    **Deanna R. Jackson, ADR Staff Mediator, at  (216) 522-7415**
   If you **DO NOT** wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above.  Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| **Leona J. Smith,**<br>**Acting Intake Supervisor** | **Cleveland Field Office** |
|---|---|
| *EEOC Representative* | **EEOC, AJC Fed Bldg**<br>**1240 E 9th St, Ste 3001** |
| *Telephone*   **(216) 522-7515** | **Cleveland, OH 44199**<br>**Fax: (216) 522-7395** |

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] Race  [ ] Color  [ ] Sex  [ ] Religion  [ ] National Origin  [X] Age  [X] Disability  [ ] Retaliation  [ ] Genetic Information  [ ] Other

### See enclosed copy of charge of discrimination.

| Date<br><br>March 11, 2015 | Name / Title of Authorized Official<br><br>**Connie Davis,**<br>**Supervisory Investigator** | Signature<br><br>*Connie Davis* |
|---|---|---|

DEFENDANT'S EXHIBIT 2   6-28-16

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA | AMENDED |
| | ☒ EEOC | 532-2015-00360 |

| Ohio Civil Rights Commission | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)*  **Ms. Kathryn Fortunate** | Home Phone *(Incl. Area Code)* **(216) 249-7228** | Date of Birth Redacted |
|---|---|---|
| Street Address **15620 Holliday Avenue, Cleveland, OH 44110** | City, State and ZIP Code | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name **UNIVERSITY HOSPITALS HEALTH SYSTEM** | No. Employees, Members **500 or More** | Phone No. *(Include Area Code)* **(216) 844-3144** |
|---|---|---|
| Street Address **11100 Euclid Ave,  Cleveland, OH 44106** | City, State and ZIP Code | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| Street Address | City, State and ZIP Code | |

FEB 19 2015

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest          Latest |

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN

☐ RETALIATION   ☒ AGE   ☒ DISABILITY   ☐ GENETIC INFORMATION

☐ OTHER *(Specify)*

**10-29-2014     10-29-2014**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

In March of 2003 I was hired by the Respondent as a Secretary. On October 29, 2014 I was discharged. I have a disability.

I believe that Deb Conti (Supervisor) discriminated against me when I asked to perform duties that I had not been trained on.  Due to my disability I was not performing at an acceptable level. I was placed on a PIP in 2013. In October of 2014 I advised my supervisor that I had a disability.

I believe that I was discharged due to my disability in violation of Title I of the Americans with Disabilities Act of 1990 as amended ADA. I believe that I was discriminated against because of my age (67) in violation of the Age Discrimination in Employment Act of 1967 as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 2-9-15 _____   *Kathryn Fortune* Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

Email: Jennifer.levin@uhhospitals.org

***University Hospitals Medical Group, Inc.***

September 9, 2008

Baha Arafah, M.D.
Dept. of Endocrinology
Lakeside, 8th Floor
11100 Euclid Ave.
Cleveland, Ohio 44106

Dear Dr. Arafah,

This letter is to confirm that Ms. Kathryn Fortunato is under my care for the treatment of an anxiety disorder. She will be undergoing cognitive behavior therapy twice monthly.

Sincerely,

Jennifer B. Levin, Ph.D.
Clinical Psychologist



University Hospitals

| Performance Improvement Plan | | | |
|---|---|---|---|
| Date: | December 3, 2013 | To: | Kathryn Fortunato |
| | | | |
| From: | Deb Conti | Cc: | |
| ☒ Initial PFP | ☐ 15 day follow-up | ☐ 30 day follow-up | ☐ 45 day follow-up   ☐ 60 day follow-up |

The following Performance Improvement Plan was prepared as a follow-up to recent discussions we had relating to your performance.  The specific areas for improvement are listed below, along with my expectations for when I need to see improvement to occur.  While I expect to see immediate improvement, I want you to know what I want to see is consistent improvement in the areas set forth below.  Therefore, together we will review your performance against these areas formally on a regular basis over the next sixty days.

Issue #1        Effective Communication Skills

As a Doctor's Secretary at University Hospitals you are expected to have good communication skills and utilize those skills to support your physician and co-workers.  Effective communication will aid you in building trust between you and the providers you support, as well as, your co-workers..  The following are some examples of problems in this area:

- *Emails without subject lines.*
- *Not using the proper greeting when answering the phone.*
- *Incomplete written communication.*
- *Using internal references like "bumped" or cancelled" when speaking with patients.*

Expectations going forward:

- All emails should contain a subject line which references the topic in the body of the email.
- The proper greeting should be used when answering the phone: "Division of Endocrinology, this is Kathryn, how may I help you?
- Any notes, messages or emails should contain information on to whom the message is addressed, the date the message was taken, proper spelling of the patient's name, the patient's date of birth, MRN, and phone numbers.  The message should include all pertinent details and be signed and dated by the doctor's secretary.
- When speaking with patients, your communication should be understanding, empathetic, and helpful.  For example, if a patient is on workflow dashboard to be rescheduled, your communication should be: "Hi, (patient name), this is Kathryn from (Dr. Name) office, I'm calling regarding your appointment on (date).  Due to a scheduling conflict, we need to reschedule your appointment to a time when we can provide the best patient care"  Then offer the patient available slots.

DEFENDANT'S
EXHIBIT
9
6-28-16
PENGAD 800-631-6989

Page 1

UHPS000329

**Issue #2**      **Effective use of Athena**

As a doctor's secretary you are expected to use Athena according to your training,, as well as, schedule appointments within the provider's templates.  The following are some examples of problems in this area:

- *Creating a slot when scheduling patients.*
- *Not scheduling in the correct location for the provider.*
- *Scheduling appointment for less than the provider's required appointment time.*    *HAve noT CREATED Any slots while working on Reschenely*

Expectations going forward:

- Schedule patient appointments in the available slots only., without creating a slot.
- Verify that you are in the proper location in Athena before scheduling a patient.
- Schedule appointments according to the requirements of the provider.  For example, 20 minutes for follow ups and 40 minute new appointments for Dr. Sood.
- End the call with the patient by repeating the name of the provider and the date and location of the scheduled appointment.

**Issue #3**      **Effective use of UHCare Ambulatory**

As a doctor's secretary. you are expected to use UHCare Ambulatory according to your training, as well as, according to the requests of your providers.  The following are some examples of problems in this area:

- *Not entering messages into call processing.*
- *Not entering prescriptions into UHCare Ambulatory.*

Expectations going forward:

- All messages must be entered in to the call processing function of UHCare Ambulatory.
- All prescription requests must be entered into UHCare Ambulatory.
- Any information your provider requests to be scanned into UHCare Ambulatory, must be scanned.

**Issue #4**      **Acceptance of a diverse workforce**

As an employee of University Hospitals, you are expected to accept and respect the diverse cultures, races, ethnicities, etc of our workforce.  The following are some examples of problems in this area:

- *References to the work performance of your African American co-workers as "you know how they are"*
- *Referring to someone's race as the reason for poor work performance.*

Expectations going forward:

- All references to co-workers should be professional and focus on performance, not race, ethnicity, etc.    *I Do noT Focus This WAy TRy To Be ProfesionaL As possible*

**Issue #5**      **Working according to manager's instructions**

As an employee of University Hospitals, you are expected to work according to your scheduled hours and effectively perform the duties assigned by your manager.  The following are some examples of problems in this area:

- *Not transferring phones to co-workers as instructed.*
- *Not pulling charts for co-workers.*    *I Do TRansfer Phone or pull charts as Requested*

Page 2

UHPS000330

*Any Prior Dissatisfaction could have been related to the fact I had a medical issue not aware of until noted by PCP & treated as in patient.*

- *Not preparing charts as instructed.*

**Expectations going forward:**

- Work hours scheduled by manager.
- Perform duties as assigned..

Your future success resides in your ability to improve your performance in these key areas.  I am hopeful that you will take the necessary steps to improve your performance.  You will need to take the appropriate actions to work on the areas above and take advantage of the hospital resources.    I am also available to assist in your development.

Next Steps:
- First follow-up meeting (15 days from the date of the PIP)
- Second follow-up meeting (30 days from the date of the PIP)
- Third follow-up meeting (45 days from the date of the PIP)
- Fourth follow-up meeting (60 days from the date of the PIP)

This Performance Improvement Plan is intended to allow you a reasonable amount of time to correct the performance issues noted in this document.  Not meeting the expectation set forth in this Performance Improvement Plan can result in your immediate discharge.

Employee Acknowledgement and Receipt of this Document:

_Kathryn Foster_____

Employee Signature

_Deborah A Conti_____

Manager Signature

_____
Date

_12/5/13_
Date

UHPS000331